No. 19-99002

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LEROY MCGILL,

Petitioner-Appellant,

vs.

DAVID SHINN[*], et al., Arizona Department of Corrections

Respondents-Appellees.

On Appeal from the United States District Court
for the District of State
Case No. CV-12-01149-PHX-CKJ

## PETITIONER-APPELLANT'S OPENING BRIEF

JON M. SANDS
Federal Public Defender
District of Arizona

Jennifer Y. Garcia (AZ No. 021782)
Sara Chimene-Weiss (MA No. 691394)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816  telephone
(602) 889-3960  facsimile
jennifer_garcia@fd.org
sara_chimene-weiss@fd.org
Attorneys for Petitioner-Appellant

---

[*] David Shinn is substituted for his predecessor, Charles L. Ryan, as Director of the Arizona Department of Corrections, pursuant to Fed. R. App. P. 43(c)(2).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION .......................................................................................... 2

JURISDICTIONAL STATEMENT ...................................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

CERTIFIED ISSUE .......................................................................................2

I.    McGill received ineffective assistance of counsel at the penalty phase of his capital sentencing because his counsel failed to investigate, develop, and present significant and compelling mitigation evidence............2

UNCERTIFIED ISSUES ...............................................................................3

II.    McGill received ineffective assistance of counsel at the aggravation phase of his capital sentencing because his counsel failed to effectively investigate and challenge the prior serious offense aggravating factor alleged by the State. ...............................................................................3

III.    McGill received ineffective assistance of counsel at trial because his counsel failed to obtain and present testimony from an expert arson investigator to challenge the state's witnesses and arguments.......................3

IV.    The application of Arizona's death-penalty statute to McGill violated the Ex Post Facto Clause of the U.S. Constitution. ..........................................3

STANDARD OF REVIEW .............................................................................3

STATEMENT OF THE CASE.........................................................................4

    I.    Social History ................................................................................4

    II.    The Crime........................................................................................24

    III.    Procedural History.........................................................................26

        A.    Trial................................................................................26

        B.    Direct Appeal .................................................................32

        C.    State Post-Conviction Proceedings .............................32

        D.    Federal Habeas Corpus Proceedings..........................34

SUMMARY OF THE ARGUMENT .................................................................34

ARGUMENT ..............................................................................................37

I.    McGill received ineffective assistance of counsel at the penalty phase of his capital sentencing because his counsel failed to investigate, develop, and present significant and compelling mitigation evidence..........37

    A     Introduction ...................................................................37

    B.    The state court's determination is not entitled to deference. ..............39

        1.    The state court made objectively unreasonable factual determinations in denying McGill's claim. ..................39

            a.    Substance addiction .....................................................39

            b.    Sexual assault...............................................................44

            c.    Brain damage and cognitive dysfunction ......................45

        2.    The state court's analysis was an unreasonable application of and contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1). ..............................47

    C.    Trial counsel's performance was deficient, prejudicing McGill. .......50

        1.    Counsel performed deficiently.................................................51

            a.    Failure to develop a relationship of trust.......................52

            b.    Failure to obtain records ...............................................55

             c.    Failure to adequately prepare Dr. Lanyon......................56

            d.    Failure to adequately investigate, present, and explain evidence of substance addiction, sexual assault, and domestic violence.......................................59

                i.    Substance addiction.............................................60

                ii.    Sexual assault .......................................................61

                iii.    Domestic violence ................................................64

         2.    McGill was prejudiced by counsel's failures............................64

II.   McGill received ineffective assistance of counsel at the aggravation phase of his capital sentencing because his counsel failed to effectively investigate and challenge the prior serious offense aggravating factor alleged by the state...................................................................71

    A.    The state court made objectively unreasonable factual determinations in denying McGill's claim that his counsel provided ineffective assistance during the sentencing phase of trial..................................................................72

B.      Trial counsel performed deficiently at the aggravation phase by failing to challenge the prior serious offense aggravator. .................... 74

C.      McGill was prejudiced by trial counsel's failure to effectively investigate and challenge the prior serious offense aggravator's weight and should be granted relief. ................................................. 75

III.    McGill received ineffective assistance of counsel at trial because his counsel failed to obtain and present testimony from an expert arson investigator to challenge the State's witnesses and arguments. .................... 76

A.      Counsel performed deficiently by failing to obtain necessary information for her potential expert, and by failing to challenge the testimony of the State's arson investigator. ................................. 77

B.      McGill was prejudiced by counsel's failure to obtain necessary information for her potential expert, and by her failure to adequately challenge the testimony of the State's arson investigator and criminalist. .............................................................. 79

IV.    The application of Arizona's death-penalty statute to McGill violated the Ex Post Facto Clause of the U.S. Constitution. ........................................ 80

CONCLUSION ............................................................................................... 84

STATEMENT OF RELATED CASES ................................................................. 86

FORM 8. CERTIFICATE OF COMPLIANCE ...................................................... 87

iii

## Table of Authorities

## Federal Cases

*Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) .................................. 42, 74

*Allen v. Woodford*, 366 F.3d 823 (9th Cir. 2004) ........................................ 7, 55, 72

*Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005) .................................................. 60

*Avena v. Chappell*, 932 F.3d 1237 (9th Cir. 2019) ................................................ 56

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) ................................................. 42

*Bemore v. Chappell*, 788 F.3d 1151 (9th Cir. 2015) ................................. 56, 59, 75

*Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005) ............................................. 66, 67

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999) ........................................... 43, 50

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002) .................................... 60, 61, 70

*Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008) ................................................ *passim*

*Crittenden v. Chappell*, 804 F.3d 998 (9th Cir. 2015) ......................................... 81

*Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003) .......................................... 42

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ................................................... 41, 42

*Hendricks v. Calderon*, 70 F.3d 1932 (9th Cir. 1995) .......................................... 66

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) ...................................................... 75

*Lafler v. Cooper*, 566 U.S. 156 (2012) ........................................................... 51-52

*Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007) ......................... 55, 63, 65, 74

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................................. 41

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) ......................................................... 69

*Lopez v. Schriro*, 91 F.3d 1029 (9th Cir. 2007) ........................................ 7

*Lynce v. Mathis*, 519 U.S. 433 (1997) ................................................... 85

*Martinez v. Ryan*, 566 U.S. 1 (2012) ............................................... 80, 84

*Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) ....................................... 43, 68

*McGill v. Arizona*, 549 U.S. 1324 (2007) ............................................... 36

*McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) ................................................... 53

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) ................................................... *passim*

*Miller v. Florida*, 482 U.S. 423 (1987) ............................................... 85, 86, 87, 88

*Peugh v. United States*, 569 U.S. 530 (2013) ........................................................ 85

*Porter v. McCollum*, 130 S. Ct. 447 (2009) ........................................................ 64

*Ring v. Arizona*, 536 U.S. 584 (2002) ............................................... 86, 87

*Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010) ....................................... 59, 74

*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................... 60, 62, 78

*Sears v. Upton*, 561 U.S. 945 (2010) ........................................................ 42, 69, 74

*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002) ....................................................... 7

*Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004) ............................ 55, 64, 74

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................... *passim*

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) ..................................... *passim*

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ................................................... 49

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................................... 53

v

*Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998) ..................................................... 66

*United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983) ........................................... 82

*Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999) ............................................... 56

*Wharton v. Chappell*, 765 F.3d 953 (9th Cir. 2014) .............................................. 70

*White v. Ryan*, 895 F.3d 641 (9th Cir. 2018) ................................................... *passim*

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................... *passim*

*Williams v. Filson*, 908 F.3d 546 (9th Cir. 2018) ................................................... 61

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................ *passim*

*Yun Hseng Liao v. Junious*, 817 F.3d 678 (9th Cir. 2016) ..................................... 53

## Federal Constitution and Statutes

U.S. Constitution Art. I, § 10 ................................................................................... 84

28 U.S.C. § 2254 ................................................................................................ *passim*

28 U.S.C. § 2241 ..................................................................................................... 6

## State Cases

*State v. McGill*, 140 P.3d 930 (Ariz. 2006) ...................................................... *passim*

*State v. Ring*, 65 P.3d 915 (Ariz. 2003) ............................................................... 87

## State Statutes

Arizona Revised Statutes § 13-751 ........................................................................ 32

**Federal and State Rules**

Ariz. R. Crim. P. 6.8 ...................................................................................... 57

Fed. R. App. P. 29 ......................................................................................... 91

Fed. R. App. P. 32 ......................................................................................... 91

Fed. R. App. P. 43 ........................................................................................... 1

Ninth Circuit Rule 22-1 ................................................................................ 75

Ninth Circuit Rule 28-2.6 ............................................................................. 90

**Law Reviews**

*Capital Mitigation Investigations and Presentations*, 36 Hofstra L. Rev. 923

(Spring 2008) ............................................................................................... 67

*Listening to Foster Children in Accordance with the Law: the Failure to Serve*

*Children in State Care*, 25 N.Y.U. Rev. L. & Soc. Change 1, 7 (1999) .............. 66

## INTRODUCTION

Petitioner-Appellant LeRoy McGill's life has been marked by trauma, substance abuse, and dysfunction. The jury in his case was never given an accurate picture of his life or the events leading to the crime in this case. That fact, coupled with application of Arizona's newly-enacted death-penalty statute to him and his counsel's failure to challenge the evidence presented against him at trial and sentencing, resulted in a denial of McGill's constitutional rights.

## JURISDICTIONAL STATEMENT

McGill is an indigent death-row prisoner in custody of the Arizona Department of Corrections. This appeal arises from the district court's denial of McGill's petition for writ of habeas corpus. (Dist. Ct. ECF No. 83, 84.) The district court had jurisdiction over McGill's petition pursuant to 28 U.S.C. §§ 2241 and 2254. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §§ 1291, 1651 and 2253.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

### *CERTIFIED ISSUE*

I. **McGill received ineffective assistance of counsel at the penalty phase of his capital sentencing because his counsel failed to investigate, develop, and present significant and compelling mitigation evidence.**

*UNCERTIFIED ISSUES*

**II.** **McGill received ineffective assistance of counsel at the aggravation phase of his capital sentencing because his counsel failed to effectively investigate and challenge the prior serious offense aggravating factor alleged by the state.**

**III.** **McGill received ineffective assistance of counsel at trial because his counsel failed to obtain and present testimony from an expert arson investigator to challenge the state's witnesses and arguments.**

**IV.** **The application of Arizona's death-penalty statute to McGill violated the Ex Post Facto Clause of the U.S. Constitution.**

## STANDARD OF REVIEW

This Court reviews de novo a district court's denial of habeas relief. *Lopez v. Schriro*, 491 F.3d 1029, 1036 (9th Cir. 2007). A claim alleging ineffective assistance of counsel is a mixed question of law and fact, which this Court also reviews de novo. *Allen v. Woodford*, 366 F.3d 823, 836 (9th Cir. 2004), *amended by* 395 F.3d 979 (9th Cir. 2005); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002). McGill's federal habeas corpus petition was filed after April 24, 1996, and is therefore governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA").

**STATEMENT OF THE CASE**

**I.        Social History**

LeRoy McGill's[2] developmental years were marked by parental abandonment and neglect, trauma, neglect, and exposure to violence. These factors reinforced LeRoy's negative view of his own self-worth, poor judgment, and substance addiction, and directly led to McGill's circumstances at the time of the crime in this case.

LeRoy's mother, Ann, was the second of three children born to Marie and George Van Doren in 1936. (ER 1316.) She had two brothers. (ER 1316.) When Ann was approximately 14 years old, her father George suffered serious injuries when he fell approximately thirty feet from scaffolding at a construction site, requiring several surgeries and a lengthy recovery. (ER 886; ER 1595.)

Ann's father was never the same after his accident. He would "knock" Ann around and was verbally abusive towards her. (ER 887-88.) Given the stress, Ann's mother suffered a "nervous breakdown." (ER 886.) Ann's relationship with her father deteriorated further in 1953 when she became pregnant at 18, and her family sent her away to give birth. (ER 888; ER 1597, 1683.)

Ann's daughter was immediately placed for adoption. Ann never saw her,

---

[2] Throughout this section, McGill will be referred to as LeRoy to avoid confusion with other McGill relatives.

4

and did not remember signing consent papers. (ER 888-89.) Ann returned home to find her parents separated, with her mother having relocated. (ER 890-91.) Ann found work and got her own apartment. (ER 1316, 1597.) In January 1955, Ann started dating Clyde McGill. Clyde and Ann married a few months later. (ER 852; ER 1311, 1597; ER 162.)

The couple relocated to California in 1957 and began their family. (ER 852.) In less than six years, the McGills had five children—LeRoy was their fifth and last surviving child,[3] following Roxanne, Kean, Bryan, and Cordell. (ER 1394; ER 1330, 1335, 1383, 1399.)

Clyde was physically violent with Ann and was a chronic alcoholic; further, Clyde worked as an undercover officer and had an affair with a prostitute. (ER 1317; ER 1337, 1430; ER 150.) The marriage deteriorated in 1963 while Ann was pregnant with LeRoy; Ann divorced Clyde soon after. (ER 1311; ER 1336.) When LeRoy was four months old, Ann relocated with the children to Phoenix. (ER 853.) This was the first of many moves, uprooting the children from neighborhoods, schools, and friends.

Ann was overwhelmed with caring for five children as a single mother. In early 1964, Ann asked her brother and his wife to take Roxanne and Cordell. (ER

---

[3] Ann and Clyde's first child was born in 1956, but died in infancy. (ER 852-53.) Records indicate another child died for unknown reasons. (ER 1344.)

1315, 1596, 1696.) In July 1964, Clyde came to Phoenix. He, Ann, Kean, Bryan, and LeRoy went to breakfast. Claiming he had a flat tire, Clyde coaxed Ann out of the car on a dirt road, assaulted her, and left her there, kidnapping the children and stranding her. (ER 855; ER 797-98; ER 1311, 1317.) Clyde briefly faced felony assault charges. *Child-Theft Plea Altered*, Phoenix Gazette (July 17, 1965), *available at* www.newspapers.com/image/20054858/ (last visited October 24, 2019).[4]

Clyde took the children to California until Ann was finally able to locate them. (ER 788; ER 855.) Ann went to court to regain custody. (ER 855.) Clyde was denied visitation rights due to his continued threats to kidnap the children and his failure to pay child support. (ER 1316.)

After she regained custody, Ann and her five children moved into a cabin in Arizona owned by church friends to hide from Clyde. (ER 856, 904; ER 1317.) They later returned to Phoenix, and Ann began working at a bar. (ER 856; ER 1317.) Despite having to work day shifts, night shifts, and double shifts to make ends meet, Ann continued to bartend on and off for the next fifteen years, though she had to frequently leave her children unsupervised. At times, Ann worked two to three jobs to support her family because she received no child support. (ER 856-

---

[4] News reports indicate that the prosecutor agreed to reduce the charges if Clyde, a former Phoenix Police Reserve Officer, pled to a misdemeanor charge.

6

57.)

In spring 1965, Ann was tending bar when she met Arthur Foster. The night they met, Ann invited Arthur to her home, where he saw her five children asleep in their clothes on the floor of her one-bedroom apartment. (ER 858; ER 1673.) Ann and Arthur were quickly married, and their son Lonnie was born in 1966. (ER 1326, 1336.)

In 1966, the family moved to Albuquerque. (ER 860.) However, not long after, things changed in Arthur and Ann's marriage. Arthur was working longer hours and accepting out-of-state work. (ER 861; ER 1674.) He became increasingly controlling of Ann and often left her with little money to care for the six children while he was away. (ER 861; ER 1311, 1317.)

This change in Arthur's behavior was not limited to Ann; later, Ann learned from her children that Arthur abused them. Arthur hit Kean in the chest, knocking him across the room. (ER 870.) Arthur also slapped LeRoy in the face, knocking him across the room, because LeRoy spit gum into an ashtray. (ER 950; ER 1311.) Roxanne recalled Arthur being a "mean" and "evil" person who would punch her brothers in the back and beat them with a razor strap.[5] (ER 950; ER 1383.)

In 1968, Ann and Arthur's marriage came to a physically-violent end. They

---

[5] Arthur acknowledged physically punishing the children harder than necessary. (ER 1326.)

7

argued over the phone bill and Ann's attempt to supplement her income by taking another job. Arthur hit Ann in the back of the head with his fist, throwing her from the dining room onto a chair in the living room and knocking her unconscious. (ER 861; ER 1317-18, 1674.) Ann had a permanent injury to her eye due to Arthur's blow, limiting her vision. (ER 862; ER 1312, 1318.) Ann served Arthur with divorce papers and a restraining order. (ER 862; ER 1674.) Ann and Arthur's divorce was finalized, and she was granted sole custody of Lonnie. (ER 163-64.)

After her second divorce, Ann and her children moved to Texas. Ann noted it was a place where "nobody knew us" and "nobody would be able to find us," as Ann had learned that Clyde once again "was looking" for her and the children.[6] (ER 862-63.) Ann was a single mother again and was solely responsible for supporting six children ages twelve and under. Ann returned to bartending and relied almost entirely on Roxanne to care for her brothers. (ER 864-65.) Due to her work hours, Ann did not know whether the children were getting to school or whether they were home at night. (ER 864-65.) Roxanne was only twelve, and was responsible for five children. The kids essentially fended for themselves. (ER 953-55.) When Ann was home, she was often overwhelmed. She responded emotionally towards her children by beating them with switches, metal sauce pans,

---

[6] Roxanne recalled that they moved to San Antonio because one of Ann's boyfriends lived there. (ER 953.)

and racecar tracks. When Ann was away, the older children responded in the same manner towards the younger ones, like LeRoy, but often the beatings were worse. (ER 149.)

Ann's children tried to help her support the family. Kean and Bryan went hunting and fishing. The children mowed lawns and got paper routes. They found fruit trees and collected fruit to eat. LeRoy's siblings roamed the neighborhood collecting soda and beer bottles to turn in for money. Despite their efforts to help, the children's unstable home life affected them in many ways. None participated in after-school activities or sports, and birthday parties and holiday celebrations were limited. A pattern of problems with the law and in school emerged in each.

Roxanne grew tired of always having to care for her brothers, and wanted to participate in things other children her age were doing. At thirteen, Roxanne ran away. (ER 956-57.) Ann then sent Roxanne to live with her brother and his wife. Roxanne's first (of many) suicide attempts occurred during this time. She was "unhappy" and "wanted a mom and dad like everyone else had." (ER 961.)

LeRoy attended second grade in San Antonio. His grades and teacher comments reflected what would become a longstanding difficulty with academics. LeRoy read at a remedial level and functioned below average in ten of twelve categories. A teacher noted: "His home situation leaves much to be desired." (ER 1417-20.) Cordell also struggled academically. (ER 1374.) Cordell's difficulties

9

were attributed to "the lack of basic academic fundamentals, emotional deprivation, and visual perceptual problems." It was thought that there was "little hope in remedying such a situation[.]" (ER 1375-76.)

The McGill family had an open child-services case from June 1971 through May 1972. (ER 1406.) The family was referred to Buckner Children and Family Services by the state, as it "became obvious that [Ann] was unable to be with the children and given them the kind of supervision and care that they needed." Ann asked for LeRoy, Cordell, and Lonnie to be placed outside the home. (ER 1398.)

While Ann had planned for the children to be at Buckner for one school year, staff described Ann as "a rather inadequate parent" and anticipated a longer stay. (ER 1399.) LeRoy (age 8), Cordell (age 9), and Lonnie (age 5) were admitted to Buckner in July 1971. Bexar County's investigation found that "the children were not getting adequate treatment and needed to be taken away from their mother and placed in a foster home as soon as possible." Buckner found Ann "unable and unwilling to give the children the supervision and care that they need" and felt she had a "very offhand attitude toward placement" and seemed "exceedingly cold and almost withdrawn" as she spoke about her children. (ER 1400.)

Initially, LeRoy and Cordell were placed into foster home. (ER 1399-1400.) They were then transferred to the Buckner's Boys Ranch. (ER 1402.) When LeRoy arrived at Buckner, he was given a new wardrobe as his clothing was deemed "old,

10

not fit to wear." (ER 1403.) Buckner's administrator saw potential in LeRoy and Cordell and described them as "two of the sweetest, nicest little boys" he had known; however, he voiced concerns regarding Ann as she had only visited once and was not paying her fees. (ER 1405.)

LeRoy did well with Buckner's structure and support, but still struggled academically. During his third-grade year, LeRoy had perfect attendance and achieved mainly B and C grades, but was at a first-grade level in Reading, Phonics, Spelling, and Writing. LeRoy's test scores reflected an 80 I.Q. and a mental age equivalent to a six-year-old child when he was eight. LeRoy scored in the eleventh percentile on this test and in the fifteenth percentile on another. (ER 148.)

Buckner enrolled LeRoy in their summer reading program. His teacher noted LeRoy was "definitely reading below grade level" and would benefit from a "special reading teacher." She found LeRoy "cooperative, quiet" and he "tried very hard to do good work," but tended to give up on challenging tasks. (ER 1413-14.) Testing at the program's end indicated LeRoy was still below grade level, and his performance in Speed and Accuracy was so poor it could not be scored. (ER 1415.) LeRoy remained at Buckner for the next academic year, earning mostly Cs and Ds, but he needed improvement in many areas. (ER 1409.) LeRoy was below grade level in all areas except Arithmetic.

At Buckner, there was structure and stability, and staff and teachers who

11

worked with the boys. However, there was no counseling or emotional support. Cordell "bottle[ed] up" his emotions and held them inside. (ER 765-67, 770-71, 783-85.) It was during this time at Buckner that nine-year-old LeRoy began drinking alcohol with his peers. Soon after this, LeRoy was drinking alcohol to intoxication and mixing alcohol with other drugs. (ER 151.)

Ann's three other children continued to struggle. Eventually, Roxanne was placed at a girl's home (ER 876; ER 1345), and later in a detention center (ER 964-63; ER 1345, 1384). A friend of Roxanne's remembered hanging out with the older McGill children ditching school, smoking marijuana, and snorting cocaine. (ER 1682.) At 16, Roxanne quit school and was running away from home, using drugs, and stealing. (ER 869; ER 1385.)

LeRoy and Cordell received a letter at Buckner from Ann on May 17, 1973, which stated she was sorry she hadn't written, but things were "messy." (ER 1421-22.) She asked when school ended so she could get them. The letter was signed "Mommy, Daddy, and Boys." (ER 1421-22.) Lonnie was discharged from foster care on June 2, 1973, and LeRoy and Cordell were discharged from Buckner on June 4. (ER 1398.) Ann married her third husband, Ronald Holmes, presumably the "Daddy" referred to in the May letter, on June 9, 1973. (ER 149.)

After Ann and Ronald got married, he quit his job and began seeing other women. Ronald was a drinker who would get "violent" and "abusive" with Ann

12

and the children. (ER 768,782; ER 1333.) Overall, Ronald was "not a very good man" and was "just mean," hitting and slapping the children. (ER 768; ER 1330.) Just five months into the marriage, Ronald stole Ann's car and the small amount of money she had in savings and "took off." (ER 892.)

Shortly after, 17-year-old Roxanne gave birth to her first child, Stefan, after an affair with a married man. Roxanne then had a short-lived marriage to another man. (ER 963-64; ER 1385.) At fifteen, Kean dropped out of school and began working to help "ease [his] mother's burdens." (ER 802.) Ann's time continued to be extremely limited by her work hours and the need to financially support her family. (ER 767.) On the rare occasion when she was available, her children fondly remembered sitting around the table, talking.

The year LeRoy turned eleven, Cordell's school records indicated that they attended three schools in two different districts. (ER 1372, 1424.) LeRoy was below grade level in Reading, Language, Arithmetic, and Social Studies. There was a marked decline in his grades, conduct, and work habits for the fourth quarter. Unlike at Buckner, no one encouraged LeRoy to attend school, resulting in increasing tardies and absences. LeRoy tested significantly below grade level in Reading and Spelling, ranking in the eighth percentile. This marked decline was likely a result of his depression and his early alcohol use. (ER 150.)

Things did not improve the next year, as Cordell and LeRoy started school

13

six weeks late. (ER 1370-72, 1424.) LeRoy needed remedial course work. (ER 1418.) He needed encouragement, had a poor self-image, was shy, and was not accepted by his peers. (ER 1424.) LeRoy had a 92 IQ, with a twenty-two point difference between his verbal IQ (82) and his performance IQ (104). He was two grade levels behind in Spelling and Arithmetic. (ER 1424-25.) LeRoy's low scores were attributed to missed school and "many changes in home and school situation." (ER 1423-24.) He needed extra academic help and a tutor was recommended. (ER 1426.)

The next year represented devastating change for the McGill children. Roxanne, now eighteen, divorced her husband and returned to her mother's home with her son. (ER 1385.) Bryan, age sixteen, dropped out of school, moved out, and began working. (ER 1678.) In May, Ann applied to have Cordell and Lonnie admitted to Boysville, a residential center providing long-term care for at-risk children. Ann was earning just $250 a month, with a $130 monthly rent payment. (ER 1336-38.)

The Boysville intake reported that Ann "obviously cannot control her children and wishes others to do so" and while Boysville could provide "firm discipline and structure with frequent activities and school encouragement," unless there was "major change at home, though, little will be different upon return." (ER 1343-45.) Ann cared about her children but "[gave] up when problems [arose],"

14

and had "little control." (ER 1343-45.) Ann was likely away from home often and of "little effect" when she was present, but would like to "learn to do better." (ER 1344-46.) Lonnie and Cordell were admitted to Boysville in June 1975. (ER 1362.)

Boysville was not easy. Cordell was disciplined with a paddle (ER 1333; ER 785-86), and found Boysville stricter than Buckner (ER 769-70). Cordell also began using drugs at Boysville. (ER 1350-51, 1355.) Cordell ran away from Boysville (ER 1348), and staff noted he was desperate to leave (ER 1351). Cordell was "very opposed" to LeRoy also being admitted to Boysville. (ER 1350.) [7]

Lonnie's time there was even more troubled. Lonnie had persistent problems with temper tantrums, bed-wetting, and rule-following. The staff recognized Lonnie had emotional and behavioral problems and sought counseling. However, the counseling agency felt Lonnie needed a "constant male figure he [could] depend on" and that therapy was not "necessary." (ER 161.) Lonnie's Boysville records show multiple documented off-campus and overnight visits with men that were not relatives. One of these men sexually assaulted Lonnie and likely another boy.[8] (ER 309.)

---

[7] Cordell was eventually discharged from Boysville (ER 1343), despite staff concerns about the "effect of the home upon him" (ER 1353).

[8] In 1977, Lonnie's father Arthur learned Lonnie was at Boysville. Though Arthur had not seen Lonnie for over a decade, he contacted Boysville to arrange visits. Eventually, Ann relinquished custody, and within days, Boysville discharged Lonnie to his father. Arthur knew that Lonnie suffered sexual abuse at Boysville. (ER 1326, 1674.)

Later in 1975, LeRoy began exhibiting his own behavioral problems. (ER 1432.) LeRoy was charged with criminal trespass and placed on juvenile probation. (ER 1431.) His probation officer noted LeRoy lacked parental supervision and had "the absence of a "male figure to identify with" and "poor peer associates.""[9] In addition, LeRoy only attended 18 of the 30 days he was enrolled in school. (ER 1418, 1439.) The day after his arrest, 13-year-old LeRoy was expelled for truancy. (ER 1418, 1432, 1440.)

Ann applied for LeRoy to join his brothers at Boysville in March 1976. (ER 1320-1428.) At this time, Ann's monthly income was less than her monthly rent. (ER 1429.) The juvenile probation department required LeRoy's out-of-home placement, (ER 1428), and his middle school suspected LeRoy of drug use, with Roxanne possibly supplying the drugs (ER 1431-32.) LeRoy was in fact using marijuana daily. (ER 150.)

LeRoy was placed at Boysville in September 1976, in the farming/ranch section.[10] (ER 1441.) He was enrolled in seventh grade again. LeRoy's academic difficulties continued, and he completed the school year with all Ds. (ER 1444, 1447.) Despite his grades, LeRoy's juvenile probation ended in March 1977.

---

[9] At this time, Kean had dropped out of school, Bryan was suspended from school and had been arrested for marijuana and Roxanne was divorced, unemployed, and living in the home with her child and boyfriend.

[10] LeRoy's brother Lonnie was still there; Cordell had recently been discharged.

16

However, this positive development belied LeRoy's actual experience at Boysville; like his brother Lonnie, LeRoy also became a victim of sexual assault at the facility. One evening, LeRoy went out to the pond on the property to catch frogs. While there, two older boys snuck up on him. He was held down by one while the other raped him. His attackers held LeRoy's face down in the dirt and LeRoy feared he would suffocate to death. After the rape, LeRoy was left battered, bleeding, and alone at the water's edge. (ER 195;[11] ER 153.)

This traumatic attack was devastating to LeRoy and unsurprisingly, had a destructive effect on his already-damaged self-image and his emotional struggles. LeRoy told no one at the time about the sexual assault he had suffered. However, decades later, when LeRoy finally did speak about the rape and was evaluated by three different experts during his post-conviction and habeas proceedings, all three experts found that LeRoy suffered severe emotional trauma and had severe psychological impairment in the form of Post Traumatic Stress Disorder ("PTSD") directly related to this childhood rape. (ER 197; ER 154; ER 150.)

While LeRoy was away and alone, his family faced other challenges. Roxanne had a second child, but just six weeks later, repeating a pattern from her own childhood, Roxanne's relationship with the child's father ended and he

---

[11] Dr. Rosengard's report contains several factual errors, resulting in some discrepancy between his statements and other evidence.

provided no financial support. (ER 1385.) Roxanne was twice arrested in the following months, for delivering methamphetamine and larceny. In summer 1977, Ann relocated the family again, from San Antonio to Dallas.

In his second year at Boysville, LeRoy began to exhibit behavioral problems alongside academic issues. (ER 1455.) Like Lonnie and Cordell, LeRoy was subjected to corporal punishment and other strict discipline. LeRoy also became involved in drug use at Boysville. LeRoy was discharged from Boysville in 1978, because Ann planned to relocate to Phoenix. LeRoy had "major problems" during his last two months at Boysville and staff thought he required follow-up services (ER 1441), although no referral for any additional services was documented.

When 15-year-old LeRoy rejoined his family, he was drinking alcohol to intoxication every weekend, smoking marijuana daily, experimenting with inhalants, and using peyote. (ER 195; ER 151.) Cordell was involved with marijuana, amphetamine, and alcohol, and was on juvenile probation until he was admitted to a drug-treatment center. (ER 1333.) Roxanne had placed her two sons up for adoption and was "drinking and partying every night." (ER 1385.) Roxanne and Kean had been convicted and sentenced to probation for drug offenses.

Shortly thereafter, Ann did relocate to Phoenix with LeRoy and Kean. Lonnie rejoined the family soon after. (ER 1313.) Cordell, now sixteen, was discharged from the drug-treatment center for a lack of progress. He joined the

18

family and entered eleventh grade, but dropped out quickly thereafter.

Ann obtained a job at a utility company in Phoenix, but her children continued to struggle. (ER 858.) Roxanne attempted suicide again at age twenty-two (ER 1383), and continued to drink and use drugs (ER 1385). She became pregnant with her third child. (ER 1385.)

LeRoy enrolled in ninth grade. (ER 1467.) He received nine failing grades and earned just 1.5 credits. (ER 1467.) He returned for his sophomore year, but withdrew in January at age sixteen. He briefly reentered school in the fall, but only attended six days. (ER 1467.) LeRoy, like all his siblings, never completed high school.

LeRoy and Cordell were smoking marijuana daily and drinking alcohol heavily on the weekends. LeRoy was trying new substances such as LSD, quaaludes, and amphetamines. (ER 151.) In an attempt to better his life, LeRoy enlisted in the Army in June 1981. He was stationed in Oklahoma for basic training and received recognition for expert status with the M16 rifle and first-class status with hand grenades. However, he separated from active duty three months later for hardship reasons, joined the Army Reserve, and returned to Phoenix. (ER 1583-84.)

The McGill children continued to struggle with drug addiction and legal problems. In 1981, Roxanne gave up her third child to adoption. (ER 965.)

19

Roxanne's drug use had become worse over the years, culminating in an over twenty-year history of addiction to substances including methamphetamine and heroin. (ER 960; ER 1387.) She resorted to prostitution and shoplifting to support her addiction. (ER 971-72.) Lonnie was in juvenile detention.

In 1982, Roxanne's daughter, Aleace, was born, and they moved back in with Ann. LeRoy had a job and helped care for Aleace while Roxanne worked. (ER 1386; ER 1263.) Around this time Lonnie began to struggle with drug addiction (ER 1328), and Cordell went to prison for stealing money to buy drugs (ER 773).

LeRoy continued to work. (ER 1579; ER 1263.) He was drinking heavily at the time, and was arrested for a string of misdemeanor offenses. (ER 1262.) He became essentially homeless, living in an abandoned car (ER 1297; ER 1273), or staying occasionally with a friend (ER 1301). In April 1986, LeRoy robbed two fast-food restaurants, was arrested, and promptly took responsibility for the offenses.[12] (ER 1249, 1304-05; ER 1288, 1298.) He pled guilty to the robbery charges and a probation violation. (ER 1277-78.) LeRoy was sentenced to 10.5 years for the armed-robbery offenses and a concurrent 1.5 year sentence for the probation violation. (ER 1469.) LeRoy admitted he had been drinking heavily at

---

[12] Although LeRoy was convicted of armed robbery, he did not actually use a weapon during the crimes.

20

the time of the robberies (ER 1471, 1480), and recognized that he needed help (ER 1498). Staff noted that LeRoy appeared "extremely immature and [to] have a low self-esteem," and recommended substance-abuse counseling and educational-vocational training. (ER 1471.)

LeRoy did well within prison's structure and routine. He attended Alcoholics Anonymous meetings (ER 1495-96), and received his GED within months (ER 1486). LeRoy enrolled in college courses and, in great contrast to his earlier grades, he earned a 3.02 grade point average. LeRoy also attempted to maintain family relationships, especially with his niece Aleace. (ER 819-20; ER 1307-09.) In 1993, 30-year-old LeRoy was paroled from prison and returned to live with his mother. (ER 1543, 1546.)

After his release, LeRoy found the familiar dysfunction within his family. Kean had returned to Phoenix and moved in with his girlfriend, Angela Taylor. Roxanne had given birth to another daughter, continued to struggle with addiction, and relocated to California. (ER 1315, 1386.) Lonnie's drug addiction continued. After being arrested and charged with methamphetamine possession, Lonnie turned himself in and served six months in jail.

LeRoy got a job (ER 1577), and complied with the parole requirements for substance-abuse services (ER 1546-49.) LeRoy left his job in March 1994 (ER 1577), and successfully completed the drug program the same month (ER 1549).

21

LeRoy finished parole in July 1994.

After briefly staying with Kean, LeRoy got an apartment in the same complex as his brothers Kean and Cordell in Phoenix; a home he would remain in for seven years. (ER 934; ER 1320; ER 1567.) Kean's girlfriend Angela had a brother, Robert, and he moved in with LeRoy for a time because his girlfriend, Bonnie, was incarcerated. LeRoy wanted to write to someone, so Angela and Bonnie arranged for LeRoy to correspond with Bonnie's cellmate, Jonna Hardesty. (ER 805.)

LeRoy and Hardesty developed a relationship through their letters. Though they had not yet met in person, Hardesty was paroled to LeRoy's home in January 1996. LeRoy worked at a construction company at the time and lived with Lonnie. Lonnie moved out of LeRoy's apartment soon after Hardesty's arrival, both because Hardesty and LeRoy began to use methamphetamine, and because of Hardesty's bizarre and violent behaviors.[13] (ER 308.)

Hardesty frequently behaved bizarrely and violently in front of LeRoy's family and friends. Hardesty claimed that she had once been a Navy SEAL (ER 826), had a "chip" implanted in her brain (ER 826), and that the government was

---

[13] Hardesty exhibited mental-health issues before her relationship with LeRoy, and had been placed in a psychiatric facility because she was hallucinating and running down the street nude. Hardesty herself stated that she had been institutionalized in a mental-health facility, diagnosed with "paranoid schizophrenia," and placed on medication. (ER 832.)

tracking her. Hardesty would take apart televisions or radios to inspect them for "bugs" (ER 256-57). She broke glass objects and then used a hose to wash the glass out of the home. (ER 804, 829; ER 1381.) Hardesty would talk of having people killed. (ER 805, 826-27; ER 1314, 1381.)

Hardesty had personally castrated her cat; some family members observed Hardesty covered in blood afterward and speaking as if she relished it. (ER 775, 827; ER 1381; ER 256.) Hardesty, nude and yelling, had also once chased LeRoy down the driveway as he was leaving home. (ER 804, 830; ER 253.) Hardesty and LeRoy used methamphetamine together throughout their relationship. (ER 776; ER 257; ER 254.) LeRoy's use became greater and more disruptive to his life over time. (ER 254.)

LeRoy began working with Kean in November 1996, and he stayed with this job for years. (ER 1551-54; ER 1381; ER 807, ER 1314.) He took great pride in his skills as a framer for luxury homes, and was dedicated to this job despite his ever-increasing drug use and Hardesty's constant disruptions.[14] Despite her abusive behavior, Hardesty had an unusual hold on LeRoy that he could not escape. (ER 806, 831; ER 1381; ER 308; ER 257; ER 253.)

---

[14] Hardesty would throw LeRoy's belongings out of the apartment or threaten to set things on fire if he left home. (ER 804, 830, 838; ER 1381; ER 253.) Hardesty also verbally abused LeRoy, threatening him or belittling him. (ER 777, 806, 828; ER 1381.)

23

**II.**      **The Crime**

In April 2002, McGill's life took a drastic turn for the worse. His mother was then battling cancer (ER 851), and he lost the position as a skilled carpenter he held for more than five years (ER 1558). Later that month, McGill lost the apartment where he had lived for the past seven years. (ER 934; ER 1319-20.) Homeless and unemployed, McGill continued to use methamphetamine regularly. (ER 1567; *see also* ER 441-42.) Friends who saw McGill around this time noticed that he appeared under the influence of methamphetamine; was disoriented, appeared "tweaked out" on several occasions, and sometimes did not recognize people that he knew. (ER 254.)

In the weeks preceding the crime, McGill and Hardesty were homeless and using methamphetamine frequently. (ER 1567; *see also* ER 441-42.) When not living out of their truck, McGill and Hardesty occasionally stayed with Jack Yates in a small, one-bedroom apartment. (ER 1163, 1174-75, 1222; ER 1120.) In summer 2002, Charles Perez and his girlfriend, Nova Banta, also lived with Yates, as did Edwin and Kimberly Keith and their daughters. (ER 1161-63, 1220-22; ER 1120.) Hardesty's brother, Jeffrey Uhl, also occasionally stayed with Yates. The Yates apartment was "busy," with people frequently gathering to use methamphetamine and marijuana. (ER 1174-75; *see, e.g.*, ER 1234.) Less than a week before the crime, a shotgun was stolen from Yates. (ER 1171, 1173-74.)

24

Banta told Yates that Perez saw Hardesty and McGill steal it. (ER 1171, 1176.) As a result of these allegations, McGill and Hardesty could no longer stay at Yates's apartment. (*See* ER 1071.)

On July 12, 2002, McGill and Hardesty were instead staying at Sofia Barnhart's home, in walking distance of Yates's apartment. (ER 1064, 1070.) Justin Johnson also lived with Barnhart. (ER1064.) McGill and Hardesty told Barnhart that they needed to get away from Yates's apartment due to the argument over the shotgun. (ER 1071.) McGill had been using methamphetamine heavily and had not slept in several days. (ER 1567; ER 441-42.) At Yates's apartment, Banta, Perez, Yates, Uhl, and the Keiths had also been using methamphetamine and marijuana. (ER 1172, 1175, 1234-35, 1244; ER 1121; ER 1116.) That evening, McGill appeared to be "very high" on methamphetamine.

In the early morning of July 13, 2002, Perez and Banta were badly burned in a fire in Yates's apartment. Although most people believed the adjoining apartment was vacant, its occupant, Mary Near, exited unharmed. (*See* ER 1166; ER 1122-24.) Perez died as a result of injuries sustained in the fire. Banta survived. At the hospital, immediately following the fire, Banta stated that a man named Leroy or Larry poured gasoline on her and Perez and lit them on fire. (ER 1244, 1245-46.) Banta testified at trial that Leroy McGill had caused her injuries and Perez's death. (ER 1164-65.)

25

### III.   Procedural History

#### A.   Trial

On March 11, 2003, McGill was indicted on one count of first-degree murder, one count of attempted first-degree murder, two counts of arson of an occupied structure, and three counts of endangerment. (ER 1734-1737.) On June 2, 2003, attorney Maria Schaffer, of the Office of the Legal Advocate ("OLA"), was appointed to represent McGill. (ER 1729-33; ER 1728.) This was the first capital case that Schaffer handled as lead counsel. (ER 322.) Elizabeth Todd was later assigned as second chair. (ER 1697-1728.)

On June 9, 2003, the State provided notice it intended to seek the death penalty, alleging three aggravating factors. (ER 1725-26.) The defense moved to strike the State's notice of intention to seek death and the State's allegation of death, arguing that because Arizona did not have a constitutional death-penalty statute in effect at the time of the crime, applying the later-enacted death-penalty statute would violate the U.S. Constitution's prohibition on ex post facto laws. (ER 1710-20; ER 1706-07.) The court denied the motion. (ER 1700; ER 1699.)

Schaffer attempted to obtain experts to assist in the investigation and presentation of McGill's defense and mitigation. (*See* ER 322-23.) To obtain experts, Schaffer submitted requests to Susan Sherwin, OLA's head. (*See* ER 323-24.) Due to Sherwin's policies and denials, Schaffer could not retain requested

26

experts or obtain sufficient funding. (ER 322-23.) Schaffer acknowledged that it would have been appropriate to retain such experts for McGill's case and that her inability to obtain such experts worked to McGill's detriment. (ER 216-20; *see also* ER 324-25.) Schaffer also reported difficulties with the investigator assigned to the case. (ER 323-24.)

McGill's trial began on October 20, 2004. (ER 1160.) The State first presented Banta's testimony; she identified McGill. (ER 1164-65, 1167-70.) Next to testify were Johnson and Edwin Keith, two witnesses that came forward mere months before trial, years after the crime. (ER 1079-80; ER 1177-1218, 1219-1243; ER 1696.) Johnson testified that he saw McGill outside shortly before the fire and when McGill returned to Barnhart's home after the fire, he smelled of kerosene and made statements indicating responsibility for the fire. (ER 1191, 1193-96, 1200-01.) Keith testified that McGill was at the Yates apartment the night of the crime, and before the fire, Uhl and McGill told Keith to leave the apartment. (ER 1225-27.) The State concluded with Dr. Philip Keen, the medical examiner who performed Perez's autopsy. (ER 1098-1118.)

The defense presented Sofia Barnhart's testimony. (ER 1062-69.) Barnhart testified that McGill was staying with her at the time of the crime, she believed that he did not leave her apartment, and she never heard McGill discuss being responsible for the fire. (ER 1064, 1066-69.)

On October 27, 2004, the jury found McGill guilty of all charges. (ER 984-87.) The aggravation phase began that same day. (ER 988-1060.) The State alleged three aggravating factors: 1) McGill was previously convicted of two counts of armed robbery; 2) McGill knowingly created a grave risk of death to Jack Yates, Jeffrey Uhl, and Mary Near; and 3) McGill committed the murder in an especially heinous, cruel, or depraved manner.[15] (ER 991.) The State presented a fingerprint expert and Dr. Keen. (ER 999-1019.) The fingerprint expert established that McGill's fingerprints matched those on the records for the two armed-robbery convictions. (ER 1013-1019.) Dr. Keen testified about Perez's injuries and the pain burns cause. (ER 1010-12.) The State introduced six additional autopsy photographs. (*See* ER 1003.)

Following the State's aggravation case, the defense moved for a judgment of acquittal on the zone of danger factor and the heinousness and depravity factor's elements of helplessness and senselessness. (ER 1020-21.) The trial court concluded that the State had not presented sufficient evidence that McGill knowingly created a grave risk of death to Mary Near. (ER 1023.) The trial court permitted all other alleged aggravating factors to go to the jury. (ER 1023.) On

---

[15] Codified at Arizona Revised Statutes ("A.R.S.") § 13-751(F)(2), (3) and (6) (2003), respectively. The Arizona legislature in 2019 removed the (F)(3) "knowingly created a grave risk of death to others" factor, thus they have since been renumbered.

28

October 28, 2004, the jury found the three factors proven beyond a reasonable doubt. (ER 981-82; ER 147.)

Over four days, the defense presented mitigating evidence. (*See* ER 839; ER 760; ER 738; ER 460.) McGill's relatives, including his mother, grandmother, sister, and two of his brothers, testified about McGill's childhood and their love for McGill. (ER 850-932, 941-979; ER 761-820.) McGill's former landlord, McGill's former employer, and a family friend also testified. (*See* ER 933-941; ER 821-828.)

The defense's mitigation investigator presented the bulk of mitigation. (*See* ER 738-759; ER 635-737; ER 461-543.) She provided information about McGill's background, essentially summarizing secondhand records related to McGill's placements, education, and childhood, as well as interviews with family or people who knew McGill during childhood. (*See* ER 739-59; ER 636-737; ER 461-543.) The State elicited on cross-examination that the investigator was employed by OLA, and was a member of the defense team. (ER 505-06.)

Despite recognizing a need for additional experts, the defense only presented neuropsychologist Richard Lanyon. (ER 544-634; ER 322-23.) Lanyon testified about the neuropsychological testing performed on McGill. (*See* ER 544-577.) Lanyon testified that McGill lived in an unstable environment as a child and was neglected by his mother. (ER 548-49; ER 1559-67.) Lanyon testified that McGill

29

likely remained with Hardesty as a result of McGill's distorted view of relationships with women, a product of McGill's neglectful childhood. (ER 553-55.)

Lanyon's neuropsychological testing did not reveal any major cognitive deficits or impairments in McGill's executive functioning. (ER 570, 605-07; ER 610, 1571-73.) This testing did show a brain-related impairment in language and symbolic skills that could be indicative of a brain injury. (ER 570-71, 610; ER 1569, 1573.) Lanyon also provided some cursory information about methamphetamine, saying "methamphetamine has a number of different effects . . . many people, it makes them paranoid, actively paranoid, and seriously impairs their judgment." (ER 566.) Schaffer did not inquire further about the effects of McGill's "heavy" methamphetamine use. (*See* ER 566-67.)

Lanyon focused on a reported head injury from a car accident when McGill was twenty-two, not long before he was convicted of armed robbery. (*See* ER 561-64; ER 1566, 1572-73.) He noted McGill's reported behavioral change following the accident, including loss of normal drive and motivation, apathy, a period of homelessness and unemployment, were "exactly the symptoms of frontal lobe damage." (ER 562-63.) Lanyon noted in his report and testified that McGill did not remember the robberies. (ER 1567; ER 563-64.) Lanyon's report attributed the memory loss to an alcohol-induced blackout. (ER 1572.) However, at trial, Lanyon

30

stated that he now believed that the brain injury "wiped out" McGill's memory of the robberies. (ER 563-64.) He relied on McGill's lack of memory of the robberies as an indication of frontal-lobe damage, and testified that McGill's brain injury was potentially a causal factor in the robberies. (ER 563-64, 588-89, 593.)

However, Lanyon's testimony was largely discredited when the State showed Lanyon the police reports and the pre-sentence report associated with McGill's armed-robbery convictions. (ER 593-603.) The reports demonstrated that at that time McGill remembered the armed robberies with detail. (ER 593-603.) The judge noted that Lanyon's testimony was largely discredited: the State "got Dr. Lanyon to eat those words before the end of his cross-examination . . . he so much as took it back" and that "the cross-examination on that point was very, very effective and . . . rendered [Lanyon's] opinion almost a nullity, a really discredited opinion." (ER 409-10.)

In rebuttal, the State presented out-of-court statements of Floyd Lipps, a jailhouse informant. (ER 415-49.) Lipps faced fraud charges and was jailed with McGill while McGill awaited trial. (ER 418-21.) In an interview with the State, Lipps said that McGill shared details of the crime and that McGill asked Lipps to murder Uhl because McGill believed that Uhl would testify against him. (ER 422-26.) While the State argued that the information Lipps provided was relevant to rebut McGill's assertion that he did well while incarcerated and was acting at

31

Hardesty's behest in setting the fire, the State also presented extensive statements about the details of Perez's death and McGill's alleged confession. (ER 421-25.)

Arguing that it was necessary to show McGill had a motive to kill Uhl, the State presented testimony by the detective who interviewed Uhl before Uhl's death. (ER 450-59.) Through the detective, the State introduced Uhl's out-of-court statements about the murder. (ER 450-56.) In effect, the State presented evidence of McGill's guilt that was inadmissible during the guilt phase of trial.

Finally, the State presented victim-impact evidence. (ER 411-14; ER 1255-58; ER 1244.) The jurors retired to deliberate, and on November 10, 2004, returned a sentence of death. (ER 407.)

### B. Direct Appeal

The Arizona Supreme Court affirmed McGill's convictions and sentences on direct appeal. *State v. McGill*, 140 P.3d 930 (Ariz. 2006). McGill's petition for certiorari was denied. *McGill v. Arizona*, 549 U.S. 1324 (2007).

### C. State Post-Conviction Proceedings

McGill returned to Maricopa County Superior Court for state post-conviction proceedings. On June 1, 2009, Kerrie Droban was appointed to represent McGill. (ER 364-65; *see also* ER 396-97.) On August 4, 2009, Droban filed the initial petition for post-conviction relief with a request for leave to amend. (ER 367-93.) The same day, Droban filed a request for appointment of a second

lawyer to assist with the case. (ER 394-95.) The court directed Droban to submit her request directly to the Office of Public Defense Services and forwarded Droban's request to that office. (ER 366.) The record does not contain any indication that Droban continued to pursue the appointment of a second attorney, and no second attorney was appointed to represent McGill.

On June 1, 2010, Droban filed an amended post-conviction petition, alleging numerous ineffective-assistance-of-counsel-at-sentencing claims. (ER 332-63.) The court ordered an evidentiary hearing on McGill's claim that Schaffer failed to retain experts to present evidence of McGill's cognitive impairment and establish a causal nexus between that impairment and the crime. (ER 86.) The court denied relief on the merits of all other claims without granting a hearing, finding the claims not colorable. (ER 86-88.)

An evidentiary hearing occurred on October 4-5, 2011. (ER 199; ER 165.) Dr. Joseph Wu testified for the defense about indications of brain damage a positron emission tomography ("PET") scan of McGill's brain showed. (ER 204-15.) Psychiatrist Dr. Richard Rosengard testified about his evaluation of McGill. (ER 166-77, 178-186.)

Droban also called Dr. Lanyon, the defense neuropsychologist at trial, who testified that the PET scan would have been helpful because it was consistent with his conclusion that McGill suffered from a brain injury. (ER 200-03.) Finally,

33

Droban called lead trial counsel, Maria Schaffer, to testify about her attempts to retain additional experts and the obstacles OLA imposed. (ER 216-27.) After the hearing, the court concluded that McGill had failed to prove that counsel was ineffective and denied relief. (ER 81-82.)

Droban filed a petition for review in the Arizona Supreme Court on December 5, 2011, which the court denied on May 30, 2012 (ER 231-52; ER 74.) Undersigned counsel was appointed to represent McGill in federal habeas proceedings on June 1, 2012. (Dist. Ct. ECF No. 9.)

### D.     Federal Habeas Corpus Proceedings

McGill filed a petition for writ of habeas corpus on April 8, 2013. (Dist. Ct. ECF No. 30.) The district court denied McGill's petition, along with his motion for evidentiary development, granted a certificate of appealability regarding Claim One, and entered judgment against him. (*See* ER 4-73; ER 3.) McGill filed a timely notice of appeal on February 2, 2019. (ER 1.)

### SUMMARY OF THE ARGUMENT

McGill was denied the effective assistance of counsel during his capital trial when his trial counsel failed to investigate, develop, and present significant and compelling evidence in mitigation of his crime. The state courts made numerous unreasonable determinations of fact and unreasonably applied clearly established federal law when denying McGill's claim, and the district court repeated many of

34

the same errors. Counsel did not conduct a reasonable mitigation investigation, and she failed to form relationships of trust with McGill and his family. Although she consulted with several experts, she called only one expert to testify that even she found unqualified and unprepared, and she further failed to provide that expert with the materials necessary to conduct his evaluation. Due to her unreasonably limited investigation and lack of appropriate experts, jurors never heard evidence of McGill's history of substance abuse, the sexual assault he suffered as a child, or the domestic abuse he experienced in his relationship at the time of the crime. This failure prejudiced McGill because the evidence that trial counsel did not present undermines confidence in the outcome of his sentencing.

McGill's sentencing was further marred by his counsel's failure to investigate and present evidence explaining and undermining the "prior serious offense" aggravating factor in this case. Respondents and the district court concede that the state court made serious factual errors in denying this claim, resulting in several unreasonable determinations of fact. Counsel should have clarified for the jury that McGill was actually unarmed during the offenses, and explained how McGill's brain dysfunction, substances abuse, and trauma history affected his behavior at that time. Had counsel performed effectively, jurors would have given this aggravating factor little weight, and when combined with the significant mitigation evidence that was not presented, there is a reasonable probability that at

35

least one juror would have concluded that the balance of aggravating and mitigating circumstances here did not warrant death.

McGill's counsel also made significant failures during the guilt phase of trial, most notably when she failed to investigate and challenge the State's witnesses. Testimony and argument regarding McGill's supposed use of styrofoam during the crime permeated the guilt phase, and was also discussed in the Arizona Supreme Court's opinion affirming the cruelty aggravating factor on direct appeal. However, there was no evidence that McGill used styrofoam during the crime. Had his counsel challenged the State's arguments otherwise, there is a significant probability that at least one juror would have weighed the aggravation and mitigation evidence differently. McGill's post-conviction counsel failed to raise this claim, and the district court erroneously held that it was not "substantial" enough to overcome the procedural default.

Finally, McGill's case is unique in that the crime in question occurred during the time after Arizona's capital-sentencing scheme had been declared unconstitutional by the U.S. Supreme Court, but before Arizona had enacted a new statute. Accordingly, application of this new statute to McGill violated the Ex Post Facto Clause of the U.S. Constitution, and the Arizona Supreme Court's decision otherwise was an unreasonable application of clearly established federal law.

36

## ARGUMENT

### *CERTIFIED ISSUE*

**I.    MCGILL RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS CAPITAL SENTENCING BECAUSE HIS COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT SIGNIFICANT AND COMPELLING MITIGATION EVIDENCE.**

McGill's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated by the ineffective assistance of his counsel at sentencing. The state court's denial of this claim constituted an unreasonable application of clearly established federal law, and relied upon unreasonable factual determinations. 28 U.S.C. § 2254(d)(1), (2). The district court erred in denying this claim, and McGill is entitled to relief.

### A.    Introduction

"There is no more important hearing in law or equity than the penalty phase of a capital trial." *Correll v. Ryan*, 539 F.3d 938, 946 (9th Cir. 2008). The Eighth and Fourteenth Amendments enshrine the guarantee of individualized sentencing and due process in the capital context. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 602-05 (1978) (plurality opinion). A capital sentencer must have the opportunity to assess "the character and record of the individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). Consideration of an offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of

37

death." *Id.*

In *Strickland v. Washington*, the Court recognized that the effective assistance of counsel is necessary to safeguard these principles. 466 U.S. 668, 684-85 (1984). In *Strickland*, the Court outlined the standard for determining if counsel has provided ineffective assistance. Counsel is ineffective if: "representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 669. Consistent with this, the Court has held that defense counsel has a constitutional duty to investigate and present mitigating evidence. *See, e.g.*, *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000). Accordingly, trial counsel's failure to adequately investigate, develop, and present mitigating evidence during McGill's penalty-phase proceedings constituted ineffective assistance. *Id.*; *see also Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001); *Douglas v. Woodford*, 316 F.3d 1079, 1090-91 (9th Cir. 2003).

Any decision regarding mitigation must follow diligent investigation. *See Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003); *Sears v. Upton*, 561 U.S. 945, 953 (2010). When investigation uncovers indications that require an expert witness to further investigate and explain their significance, counsel must obtain an expert. Counsel has "an obligation to conduct an investigation which will allow a

38

determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999); *see also Mayfield v. Woodford*, 270 F.3d 915, 927-28 (9th Cir. 2001) (en banc).

### B.      The state court's determination is not entitled to deference.

The state court denied McGill's claim on the merits, but only after making numerous unreasonable factual determinations and unreasonably applying clearly established federal law.

### 1.      The state court made objectively unreasonable factual determinations in denying McGill's claim.

During McGill's post-conviction relief proceedings, the state court based its decision that trial counsel's performance was not deficient and that there was no prejudice on several unreasonable factual determinations. 28 U.S.C. § 2254(d)(2).

### a.      Substance addiction

McGill's long-term drug and alcohol abuse played a significant role in his life and in the crime. Trial counsel Maria Schaffer explained in post-conviction proceedings that she researched available experts and chose a local addictionologist, Lesley Croft. Croft had counseled people in Sunnyslope, the Phoenix neighborhood where the crime occurred. Sunnyslope was well-known for prevalent drug use, particularly methamphetamine, and Croft could have helped jurors understand the culture that existed in Sunnyslope at the time. (ER 323.) Croft

39

had agreed to evaluate McGill. (ER 219.) Instead, based on restrictions the head of her office enacted, Schaffer was "forced to use Dr. [Mace] Beckson[.]" (ER 219.) Despite Schaffer's strategic decision and professional opinion that a different, locally-focused expert was appropriate, she was arbitrarily overruled. (ER 219.) Beckson (who Schaffer felt was "slick") flew in from Beverly Hills, met with McGill, then declared that he could not assist Schaffer because McGill would not admit involvement in the crime. (ER 219-20.) Schaffer did not ask for additional funding or re-urge her request to retain Dr. Croft; instead, Schaffer stopped investigating McGill's addiction without strategic reason or plan.

McGill argued in post-conviction proceedings that Schaffer's failure to present testimony from an addiction specialist constituted deficient performance due to the central role McGill's drug addiction played for him, and he was prejudiced because jurors did not receive an explanation of the effects of his addiction on his behavior and mental processes. (ER 340, 361-63.) The state court disagreed, finding Schaffer "conceded" that she got an addiction specialist, "but that she did not want to use that particular expert." (ER 80.) This determination is not supported by the record, and is objectively unreasonable. Schaffer wanted to retain an addictionologist and chose one, but was denied funding by her office. (ER 219; *see also* ER 323.) Instead, she was forced to retain a different expert she felt was inappropriate. (ER 219; *see also* ER 323.) The record makes clear that Schaffer

40

did not stop working with Beckson because she "did not want to use [him]," rather, the expert himself refused to assist her. (ER 80; ER 219-20; ER 323.)

Schaffer wrote in an affidavit that "Dr. Beckson met with Mr. McGill, but ultimately opined he could not assist in the case because Mr. McGill would not admit his guilt." (ER 323.) The post-conviction court took this quotation out of context, writing of Schaffer: "she 'ultimately opined that he could not assist in the case because Mr. McGill would not admit his guilt.' (ER 323.)" The post-conviction court changed the subject of the sentence from Beckson to Schaffer; the full sentence makes clear that Beckson opined that he could not assist—not Schaffer. Reasoned jurists could not disagree about this. "[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Milke v. Ryan*, 711 F.3d 998, 1007-08 (9th Cir. 2013) (citing *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014)). "The state court's decision is [] not entitled to AEDPA deference because it seriously mischaracterized key evidence that supported [McGill's] claim." *Milke*, 711 F.3d at 1007.

Further, the state court unreasonably concluded that Beckson did not testify

41

because "the defendant would not help in his own defense[.]" (ER 219.) There is no evidence that McGill refused anything. That McGill maintained his innocence to Beckson cannot be equated with a refusal to cooperate in his defense, especially when the defenses at trial included mistaken identification and lack of sufficient evidence. (*See, e.g.*, ER 1722-24; *see also* ER 230.) Were a confession of guilt required before an addiction or other mental-health expert could evaluate a defendant, such evaluations would rarely occur. The district court recognized that Schaffer wanted to retain an expert other than Beckson, but still erroneously found that the decision to use him was counsel's trial-strategy decision. (ER 24-25.)

Additionally, the state court found that McGill had "not shown in his petition or his exhibits how any other addiction specialist would have testified without this admission." (ER 86.) This is unsupported by the record, and is objectively unreasonable. McGill provided a report and curriculum vitae from Edward French, Ph.D., a pharmacologist. (ER 304-07, 273-303.) He was qualified as an expert witness on addiction, the State did not argue otherwise, and the court did not make findings that he was unqualified on this topic. French made clear he could evaluate McGill and could have testified without an admission of guilt by examining the documentary evidence McGill's counsel provided regarding McGill's methamphetamine use and social history, and rendering an expert opinion regarding the effects of methamphetamine on McGill. (ER 304-07.) French based

42

his opinion upon McGill's history of drug use and French's research regarding effects of methamphetamines in humans, not on whether McGill was guilty. Beckson's belief that no evaluation could be performed without a confession was erroneous.

Further, despite the lack of dispute over French's ability to render an opinion, the court unreasonably ignored French's report because he had not personally evaluated McGill. (ER 86.) French is a trained pharmacologist. He was able to form a professional opinion regarding McGill and his drug addiction from the documentary evidence he reviewed, and the State did not argue otherwise.

Finally, the state court unreasonably determined that French's testimony "would add nothing to Dr. Lanyon's testimony." (ER 86.) French provided extensive information that Lanyon did not. (*Compare* ER 304-07 *to* ER 1562.) Lanyon concluded only that McGill's methamphetamine use "appears to have been continuous and a severe problem for him." (ER 1576.) Lanyon's penalty-phase testimony was similarly general: that methamphetamine makes "many people" "paranoid" and "seriously impairs their judgment." (ER 566.) Lanyon provided no testimony regarding McGill's methamphetamine use. (ER 544-634.) Given the abundant additional information French would have provided regarding the devastating effects of methamphetamine generally and in the amounts McGill used, the post-conviction court's determination that his opinion would have "added

43

nothing" is unreasonable. Echoing this determination, the district court ignored that Lanyon's testimony was extremely general about methamphetamine, and that he was almost-entirely discredited. (ER 25-26.)

### b. Sexual assault

Schaffer also failed to investigate the sexual assault McGill experienced at the Boysville facility as a teenager. The record makes clear that McGill suffered sexual assault. (ER 259.)[16] The state court unreasonably determined that McGill had not substantiated his claim of sexual assault, and thus trial counsel was not ineffective for failing to investigate this and present it at trial. (ER 87.) Dr. Rosengard's report discussed the assault, and the State did not question the report or address the assault. That information, coupled with corroborating evidence of Lonnie's sexual assault at the same facility,[17] was enough to merit an evidentiary hearing on this claim. The state court ignored Rosengard's report. A fact-finding process is flawed and this Court "can't accord AEDPA deference when the state

---

[16] Although Rosengard correctly reported that McGill was sexually assaulted by an older boy while in a boy's home and attempted to protect himself by hitting his assailant with a two-by-four, other details of the assault are incorrect in his report. These discrepancies might be attributed to Rosengard's limited interaction with McGill due to delays at prison visitation (ER 166-67), or to his lack of rapport with McGill (ER 187-89, 190-91).

[17] Lonnie's affidavit from post-conviction proceedings incorrectly identifies the location of his sexual assault as Buckner's Boys Ranch. (ER 309.) Lonnie was at Boysville when the assault occurred. (ER 309.)

44

court 'has before it, yet apparently ignores,' evidence that is 'highly probative and central to petitioner's claim.'" *Milke*, 711 F.3d at 1007-08 (quoting *Taylor*, 366 F.3d at 1001).

That McGill denied being sexually assaulted to Lanyon is not dispositive, and the state court's decision to rely solely on that fact was unreasonable. Lanyon and his report had many problems weighing against their credibility, which the trial court recognized. (*See, e.g.,* ER 409-10.) The post-conviction court's decision to ignore other, probative evidence in favor of an expert completely discredited and disavowed by trial counsel, and to conclude that McGill had not stated a colorable claim that he was sexually abused, was objectively unreasonable. *See Taylor*, 366 F.3d at 1008.

### c.     Brain damage and cognitive dysfunction

The post-conviction court's finding that it was reasonable for Schaffer's office to require her to retain Lanyon as neuropsychologist because he was on retainer is objectively unreasonable. There are numerous reasons why defense counsel might retain different experts in different cases. "Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively." 2003 Am. Bar Ass'n Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("2003 ABA

45

Guidelines") § 10.11 cmt. (citing *Caro*, 165 F.3d at 1226-27.) Schaffer did not believe that Lanyon was qualified to evaluate McGill in the area of concern, and she should have been allowed to hire the experts she thought were necessary based on her investigation.

The court did not address Schaffer's concerns with Lanyon, unreasonably finding Lanyon "was a qualified expert and Ms. Schaffer was entitled to rely on the competency of his evaluation." (ER 86.) In framing the question as whether Schaffer was reasonable to "rely" on Lanyon, the post-conviction court ignored that she did not make a strategic, reasoned decision to rely on him, rather, she was forced to by her office. (ER 322.) Schaffer could not and did not rely on the competency of his evaluation; she did not want to retain him, she thought he "did a horrible job of preparing for his testimony in this matter," that "[h]is opinions were effectively challenged by the state," and "he was not qualified for the tasks presented in Mr. McGill's case." (ER 322-21.) The court's conclusion that Schaffer was correct to "rely" on Lanyon ignored this evidence, so it was objectively unreasonable and satisfies § 2254(d)(2). *See Milke*, 711 F.3d at 1007-08. The district court erred in echoing this logic, wrongly describing Lanyon as a "properly selected expert," when he was not "selected" by trial counsel. (ER 23.)

46

**2. The state court's analysis was an unreasonable application of and contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1).**

The post-conviction court found that defense counsel's representation did not fall below an objective standard of reasonableness, and that McGill had not proven prejudice. (ER 81-82.) The district court agreed. (ER 31.) Because the state court's analysis was an unreasonable application of and contrary to *Strickland*, McGill has satisfied § 2254(d)(1) and this Court must review his claim's merits *de novo*.

In its 2010 pre-evidentiary hearing order, the state court unreasonably applied *Strickland* in analyzing deficient performance. (ER 86-87.) The court did not examine this claim in light of *Strickland,* under which performance is measured against an "objective standard of reasonableness," "under prevailing professional norms." *Id*; *see also Wiggins*, 539 U.S. at 521. Instead of asking these questions, the court focused on the "specificity of the claim," *Milke*, 711 F.3d at 1006-07, including whether French's report was reliable and whether McGill's childhood sexual assault was substantiated. (ER 86-87.) Because the state court "focused on the wrong questions in denying [McGill's claim,] it applied the wrong legal framework. Its decision is thus 'contrary to . . . clearly established Federal law' and unworthy of AEDPA deference." *Milke*, 711 F.3d at 1006-07; *see also Lafler v. Cooper*, 566 U.S. 156, 173 (2012).

The state-court analysis of deficient performance in its 2011 order, following the evidentiary hearing (ER 75-82), again ignored the *Strickland* test, and focused on the "specificity of the claim." *Milke*, 711 F.3d at 1006-07. Rather than assessing if counsel acted in accordance with prevailing professional norms in investigating and presenting evidence, the court focused on the specifics of the un-presented evidence and the mitigation that *was* presented. (ER 81.)

Further, the state post-conviction court unreasonably applied *Strickland* when it focused on whether the mitigation evidence that was not presented would have changed its view, and on an outcome-determinative test, rather than whether this evidence might have affected an objective sentencer. The state court wrote, for example, that findings were not significant "in the court's view." (ER 81.) The court also wrote that the newly presented mitigation evidence would not have been a "significant game-changer with regard to the outcome." (ER 82.) A court unreasonably applies *Strickland* when it uses an "outcome-determinative test" and as here, "determine[s] whether *it* would have imposed a death penalty if it had considered the mitigation evidence that [defendant] failed to present." *White v. Ryan*, 895 F.3d 641, 671 (9th Cir. 2018). Further, the state court unreasonably applied clearly established federal law when it focused only on the trial, and ignored that the Arizona Supreme Court had to independently reweigh the aggravation and mitigation. *See id*. (§ 2254(d)(1) is satisfied where the post-

48

conviction court erred by failing "to consider the probability of a different outcome in the Arizona Supreme Court").

Additionally, the state court erred by imposing a causal-nexus requirement in analyzing prejudice. In assessing whether the lack of testimony from Drs. Wu and Rosengard prejudiced McGill, the court determined:

> [t]he nexus between the defendant's mental condition and his actions on the night of the murder would not have been significantly strengthened by the testimony of Dr. Wu and Dr. Rosengard, and thus the Court concludes that there would not have been a reasonable probability that the result of the proceedings would have been different.

(ER 82.) In framing the question as whether the evidence would have shown a nexus between McGill's mitigation and the crime, the court imposed an unconstitutional test, contrary to clearly established law. *See Tennard v. Dretke*, 542 U.S. 274 (2004); *McKinney v. Ryan*, 813 F.3d 798, 813 (9th Cir. 2015). The state court also erred in finding Wu and Rosengard's testimony would have been "cumulative" (ER 82), when in fact it would have been corroborative of Lanyon's discredited testimony. *See Yun Hseng Liao v. Junious*, 817 F.3d 678, 695 (9th Cir. 2016). The district court repeated this error. (ER 22.)

Finally, the state-court prejudice analysis constituted an unreasonable application of *Strickland* because it did not assess the failures of counsel and the resulting prejudice cumulatively. It is improper to discard each piece of evidence that was not presented due to deficient performance by deciding that it alone was

49

not sufficiently substantial to call for leniency. *See, e.g.*, *Wiggins*, 539 U.S. at 534; *White*, 895 F.3d at 671.

Here, the court only examined Wu and Rosengard when determining whether McGill had proven prejudice. (ER 82.) The court failed to consider them in conjunction with the new evidence regarding McGill's substance abuse and childhood sexual assault, and failed to consider it along with the evidence at trial—and how appropriate experts could have properly contextualized that evidence. The district court repeated many of the same errors. For example, the district court focused on the mitigation at trial, but ignored the abundant mitigation evidence that jurors did not hear. (*See, e.g.*, ER 18.) The district court described testimony at trial about McGill's life without mentioning that much of it had been discredited, undermined, or minimized at trial. (*See, e.g.*, ER 13-16.)

The Arizona Supreme Court characterized the trial mitigation as "not insignificant." *State v. McGill*, 140 P.3d 930, 945 (Ariz. 2006). The proof of several additional compelling mitigating factors undermines confidence in the verdict.

## C. Trial counsel's performance was deficient, prejudicing McGill.

McGill has satisfied § 2254(d)(1) and (2), thus, this Court must review de novo his claim that his trial counsel failed to adequately investigate, develop and present readily available mitigation evidence, depriving McGill of a fair and

reliable sentencing.

### 1. Counsel performed deficiently.

"[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id* at 691. Counsel must conduct a thorough investigation of a defendant's history. *Williams (Terry)*, 529 U.S. at 396. Otherwise, counsel's decisions are not accorded deference. *See, e.g.*, *Wiggins*, 539 U.S. at 521; *see also Allen v. Woodford*, 366 F.3d 823, 845 (9th Cir. 2004).

Counsel's duty to investigate all potentially mitigating evidence is not discharged by conducting a limited investigation into these issues or by providing a cursory or abbreviated mitigation presentation. *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007) (citations omitted); *Stankewitz v. Woodford*, 365 F.3d 706, 716, 720 (9th Cir. 2004). Capital penalty-phase investigations should inquire into social background and evidence of family abuse, potential mental impairment, physical health history, and history of drug and alcohol abuse. *See Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc).

Lead counsel Maria Schaffer's investigation and presentation of mitigating evidence was constitutionally inadequate because she failed to provide a complete

picture of McGill's life history and impairments. *Avena v. Chappell*, 932 F.3d 1237, 1249 (9th Cir. 2019); *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999). Counsel's failure to investigate and present available mitigation cannot be held strategic because the investigation was unreasonably narrow. *See Bemore v. Chappell*, 788 F.3d 1151, 1165 (9th Cir. 2015); *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521.

Schaffer lacked the resources and experience necessary to provide effective representation. This was Schaffer's first capital case as lead counsel. (ER 322) Her difficulty obtaining funding for appropriate experts and the lack of investigative support at her office in McGill's case were among the reasons that, a month after McGill's case concluded, Schaffer left for an office where she believed clients would be better served. (ER 324-25.) Second-chair counsel Elizabeth Todd suffered mental-health difficulties during McGill's trial, causing Schaffer to take on a disproportionate share of work.[18] (ER 325.)

### a. Failure to develop a relationship of trust

Schaffer and her team failed to develop a relationship of trust or a rapport with McGill and his family. This relationship is crucial to adequate representation

---

[18] Todd was recommended for in-patient mental-health treatment shortly after McGill's trial. (ER 325.)

and the cooperation of the client and relatives. *See, e.g.*, 1989 ABA Guideline[19]
11.4.1 cmt.; 1989 ABA Guideline 11.4.2 cmt.; ABA Standards for Criminal
Justice: Defense Function Standard 4-5.2 & cmt. (3d ed. 1993); *see also* 2003 ABA
Guideline 10.5(A). "Adequate consultation between attorney and client is an
essential element of competent representation of a criminal defendant."
*Summerlin*, 427 F.3d at 633-34 (citations omitted).

The defense team's failures unreasonably limited the mitigation
investigation.[20] Schaffer met with McGill for less than ten hours between
appointment and trial. Todd visited McGill once. Due to these limited interactions
and his concerns about the investigation, McGill never trusted the team enough to
reveal crucial mitigation evidence. For example, Brewer's mitigation interviews
with McGill focused largely on his mother, and McGill disliked what he saw as
attempts to paint his mother negatively. At the time, Ann was battling cancer and
in extremely poor health. (*See, e.g.*, ER 851.) During post-conviction proceedings,
Schaffer stated: "Several members of the family including [McGill's] mother,

---

[19] At the time of McGill's sentencing, the Arizona Rules of Criminal Procedure
required counsel to be familiar with the ABA Guidelines performance standards.
Ariz. R. Crim. P. 6.8(b)(1)(iii) (2000).

[20] The district court misconstrued this part of the claim as faulting counsel for failing
to have a "meaningful" relationship with McGill. (ER 17.) However, instead, McGill
alleges that the failure to form a relationship of trust with McGill and his family was
below prevailing norms and resulted in an unreasonably truncated investigation, and
in jurors not hearing determinative mitigation evidence.

Anne [sic], were not forthcoming with information. They were either dishonest or not cooperative in answering our questions." (ER 324.) She also stated that McGill's brother "absolutely refused to cooperate in coming to court." (ER 324.) The district court dismissed Schaffer's post-conviction affidavit as not illustrating a lack of relationship of trust. (ER 18.) However, the family's lack of cooperation was due solely to counsel's failure to form a trusting relationship with them.

The defense team's behavior fell below prevailing professional norms. McGill's family did not trust the defense team due to several serious breaches of trust and sharing of misinformation by Brewer. *See ABA Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* § 5.1(C). The team knew that McGill and his siblings were not providing the full story regarding the traumatic nature of their childhood, trying to protect their dying mother, Ann. (*See, e.g.,* ER 324; ER 502.)

Further, McGill's family did not understand the reasons for the mitigation investigation, and no one explained to them why certain avenues of investigation were necessary—and why it was harmful to hide or minimize information. Under the circumstances, it was inevitable that McGill's family would not cooperate, and the lack of trust directly affected the investigation. For example, McGill never revealed the details of his childhood sexual assault, and after defense team members betrayed their trust, his family was reluctant to provide information and

54

did not sign releases for information that would have been compelling.

### b.  Failure to obtain records

Schaffer failed to obtain and provide experts several "classic" sources of mitigation. *Correll*, 539 F.3d at 943-44. This was below prevailing professional norms, and constituted deficient performance. *See Robinson v. Schriro*, 595 F.3d 1086, 1108-09 (9th Cir. 2010); *see also Bemore*, 788 F.3d at 1171 (quoting *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014)); *White*, 895 F.3d at 668. For example, Schaffer failed to obtain available records from McGill's juvenile adjudications, police reports from some prior arrests, McGill's mother's marriage and divorce records, records from Lonnie's Boysville stays, and records from siblings' arrest histories. She also did not obtain a complete set of McGill's records from school, Buckner's Boys Ranch, or Boysville. These records include crucial mitigation evidence, including test scores and grades from third and fourth grade, information about McGill's drug use, and about his juvenile record. These records would have aided Lanyon in evaluating McGill, and revealed other potential witnesses and sources of mitigation.

Further, the information about McGill's drug use and his juvenile records could have helped rebut the State's story about McGill's prior convictions. *See* Claim Two, *infra*. "Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution

55

can be crucial to persuading jurors that the life of a capital defendant is worth saving." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (citing *Wiggins*, 539 U.S. 510); *see also Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005) ("defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation"). Schaffer performed deficiently in failing to obtain McGill's records, and thus could not make informed decisions about how to represent McGill. The district court ignored this evidence, and incorrectly dismissed all of the un-presented evidence as "cumulative," despite the weight it would have added to the sentencing profile. (ER 19.)

### c. Failure to adequately prepare Dr. Lanyon

Failure to obtain the proper mental-health experts and to adequately prepare one when necessary indicates deficient performance. *See, e.g.*, *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). Schaffer was forced to retain Lanyon because he "had been placed 'on retainer'" by her office (ER 322), despite Schaffer's stated concerns that Lanyon did not have the credentials to work on such a complicated case. (ER 321-22.) She became further concerned when, after Lanyon completed his evaluation and report on McGill, but before he testified, he informed Schaffer that "he didn't like the case, and that he wasn't sure that he had what it took to do the job required." (ER 222.) Schaffer did not choose Lanyon. (ER 221.) Accordingly, hiring Lanyon and putting him on the stand was not a reasoned

56

decision, and is not entitled deference. Doing so, against her better judgment, fell below prevailing professional norms, and constitutes deficient performance.

Beyond hiring experts, counsel have "an affirmative duty to provide mental-health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro*, 280 F.3d at 1254. "The failure to prepare a witness adequately can render a penalty phase presentation deficient." *Williams v. Filson*, 908 F.3d 546, 567 (9th Cir. 2018) (internal quotation marks and citation omitted.) Counsel must provide experts sufficient information to ensure they can effectively investigate mitigating circumstances and explain them to jurors. Here, Schaffer gave Lanyon some documents, including records from McGill's prior incarceration, incomplete school records, and notes from interviews with relatives and friends. (ER 1562.) She did not provide any other records, and Lanyon did not interview witnesses. Despite his testimony that he spent six or seven hours with McGill (ER 548-49), and though he billed for a three-hour-and-fifteen-minute visit, jail records reflect a one-hour-and-forty-two-minute visit. The testing he administered alone should have taken two hours and ten minutes, minimum.

Lanyon relied heavily on McGill's report of a head injury when McGill was twenty-two. The State discredited Lanyon's testimony regarding brain damage and its effects on McGill's memory partly because he had requested medical records documenting the head injury, but the defense had not provided them. (ER 587-88.)

Further, in the midst of Lanyon's testimony about how McGill had no memory of prior armed robberies, the prosecutor provided Lanyon with police and presentence reports from McGill's prior convictions, which Schaffer had failed to provide, and which showed that McGill had a clear memory of the events. (ER 593-600.) This devastated Lanyon's testimony. (ER 593-603.)

The trial judge noted that the State "got Dr. Lanyon to eat those words before the end of his cross-examination . . . he so much as took it back" and that "the cross-examination on that point was very, very effective and . . . rendered [Lanyon's] opinion almost a nullity, a really discredited opinion." (ER 409-10.) During cross-examination, Lanyon also conceded that he should not have appeared to diagnose Jonna Hardesty with schizophrenia without evaluating her. (ER 620.) In addressing this, the district court cited Lanyon's testimony, without mentioning that it was discredited. (ER 14-15.)

Schaffer's failure to provide Lanyon police and presentence reports from McGill's priors constituted deficient performance. *See, e.g.*, *Rompilla*, 545 U.S. at 387. Schaffer testified that she did not give Lanyon the documents because McGill "had allegedly told the probation officer when she interviewed him that he had a child . . . and he needed to get out to be with that child, and we couldn't prove that." (ER 1736.) This was unreasonable. McGill does not have children, and has never claimed to. The report writer apparently confused information regarding

58

different defendants, or made an error. Schaffer could have asked McGill to clarify the information, and then provided an explanation to Lanyon along with the documents, or attempted to ask the presentence-report writer to clarify. Instead, she withheld crucial evidence from her sole mental-health expert, despite Lanyon's report regarding McGill's lack of memory of the prior arrests (which the withheld documents contradicted) and his reliance on those statements in drawing his conclusions. (ER 1570, 1575.) Schaffer later acknowledged that she should have given Lanyon the documents because the State had them and it hurt Lanyon's testimony that he was unaware of the information within them. (ER 226.)

> ### d. Failure to adequately investigate, present, and explain evidence of substance addiction, sexual assault, and domestic violence

Schaffer also failed to adequately investigate McGill's drug addiction, childhood trauma (including sexual assault), and his status as a victim of domestic violence. As a result, counsel failed to present important facts to jurors, and failed to properly contextualize and explain topics that were cursorily addressed. *See Correll*, 539 F.3d at 952; *Lambright*, 490 F.3d at 1111-12, 1124-26; *Summerlin*, 427 F.3d 623 at 642-43. "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Correll*, 539 F.3d at 942 (quoting *Mayfield*, 270

59

F.3d at 927 and *Williams*, 529 U.S. at 399.) Instead of applying this binding precedent, the district court cited out-of-circuit cases in support of its contrary finding. (*See, e.g.*, ER 24.)

There were clear indications that expert assistance was necessary to effectively investigate and present McGill's mitigation evidence to jurors. The prevailing standards of practice at the time required Schaffer to conduct a reasonable investigation into these indications. (ER 318-19.) While counsel need not pursue every possible lead, counsel's assistance is deficient when, as here, she "ignore[s] pertinent avenues for investigation of which [s]he should have been aware." *Porter v. McCollum*, 130 S. Ct. 447, 453 (2009); *Stankewitz v. Woodford*, 365 F.3d 706, 716, 720 (9th Cir. 2004). And, the presence of Lanyon did not discharge counsel's duty to retain other necessary experts. Counsel testified that she knew before trial that Lanyon was not equipped to explain to jurors McGill's complicated history and impairments. (ER 220-21.) That she still relied on him as her sole expert was below the standard of care.

### i. Substance addiction

Schaffer failed to investigate and present specific facts regarding McGill's substance addiction and use, and failed to present a drug-use and addiction expert. Schaffer did not obtain detailed information regarding McGill's history of drug use, or establish the amount and type of substances McGill had used in the days

60

and hours leading to the crime. Had she done so, even in the absence of expert assistance, she could have provided jurors with evidence regarding the gravity of McGill's substance addiction, the physical and mental condition that he was in as a result of substance abuse, and the effects of substance abuse on his mental health, behavior and the crime. Instead, jurors heard only vague references to his substance abuse, and never heard the ramifications of such abuse. This could have led jurors to discount the meager evidence of drug use entirely, instead of allowing them to place the crime in the context of years of drug addiction resulting from childhood trauma.

The lack of an addiction specialist was not due to Schaffer's reasonable decision, as discussed above. When the expert her office foisted on her said he could not help (ER 228-29), Schaffer failed to retain a different expert or to renew her funding requests for the expert she originally requested. (ER 566.)

Counsel's duty to investigate and present mitigation is not discharged by conducting a limited investigation into and presentation of important issues, such as a serious, long-term addiction to methamphetamine and other substances. *See Lambright*, 490 F.3d at 1120.

### ii.    Sexual assault

Schaffer failed to conduct an adequate investigation to discover that McGill was the victim of a brutal sexual assault when he was a thirteen-year-old resident

61

of Boysville. (ER 258.) He was devastated by the attack, and suffers from lasting effects as a result of that life-altering, traumatic event.[21] (ER 258-59.) This was compelling mitigation, and Schaffer was deficient for not adequately investigating McGill's sexual assault and for failing to present it to jurors. *See, e.g.*, *Turner v. Duncan*, 158 F.3d 449, 451 (9th Cir. 1998); *Hendricks v. Calderon*, 70 F.3d 1932, 1044 (9th Cir. 1995); *Boyde v. Brown*, 404 F.3d 1159, 1180 (9th Cir. 2005).

There were several indications that McGill was sexually assaulted at Boysville. First, counsel knew that McGill's brother Lonnie was sexually assaulted at the same facility. Just the information that McGill had been in foster care and out-of-home placements should have prompted an investigation, as sexual assault is extremely common in such institutions. *See, e.g.*, *Wiggins*, 539 U.S. at 535 (discussing defendant's sexual molestation and repeated rape in foster care); *see also* Jill Chaifetz, *Listening to Foster Children in Accordance with the Law: the Failure to Serve Children in State Care*, 25 N.Y.U. Rev. L. & Soc. Change 1, 7 (1999) (sexual abuse rate of children in state care is four times higher than in general population); *see also* 2003 ABA Guideline 4.1 cmt.; 1989 ABA Guideline 11.8.6(B)(5).

---

[21] McGill attached to his Motion for Evidentiary Development in the district court the report of Dr. James Sullivan, who echoed Lanyon's findings and diagnosed McGill with Post-Traumatic Stress Disorder ("PTSD") as a result of the attack, and Dr. Robert Smith, a psychologist who agreed with Dr. Sullivan's diagnosis of PTSD as a result of the attack. (ER 152-54; ER 1739-48.)

Further, the minimal time Schaffer and Lanyon spent with McGill was inadequate to develop the trust necessary to obtain this type of traumatic and sensitive information. *See* Kathleen Wayland, *The Importance of Recognizing Trauma throughout Capital Mitigation Investigations and Presentations*, 36 Hofstra L. Rev. 923, 956-59 (Spring 2008) (discussing barriers to obtaining thorough and credible trauma information, including brief clinical interviews). Lanyon's report illustrates this; he stated simply that McGill "denied any sexual abuse." (ER 1569.) As noted, Lanyon spent less than three hours with McGill. Even if McGill denied sexual abuse, Schaffer should not have considered that denial to indicate that no further investigation was necessary. This was below prevailing professional norms.

Schaffer failed to retain a trauma or sexual-abuse expert able to develop rapport and perform the skilled evaluation necessary for McGill to disclose his sexual assault and the life-long effects on him. A neuropsychologist like Lanyon is not trained to elicit such sensitive information, nor trained to effectively communicate trauma effects to jurors.

Instead of learning the truth about McGill's time at Boysville, jurors were led to believe that Buckner's and Boysville were fun places, characterized by farm animals and good times. (ER 783-85.) *See, e.g.*, *Boyde*, 404 F.3d at 1177-78. This false portrayal allowed the mitigation evidence that was presented to be effectively

rebutted.

### iii.    Domestic violence

Schaffer failed to properly investigate and provide expert testimony regarding the domestic violence Hardesty perpetuated upon McGill. Without an expert to explain the context of domestic violence, jurors were left to wonder why McGill stayed with Hardesty despite her violent behavior. Even defense counsel described the relationship as "sick," and Lanyon described McGill as tolerating Hardesty—framing it to jurors as if it showed McGill's depravity. (ER 400; ER 553.) A domestic-violence expert could have explained the effects of domestic violence on McGill, and why they were mitigating, rather than demonizing. *See Correll*, 539 F.3d 976 n.5, 942; *Mayfield*, 270 F.3d at 927. The district court erred in finding that domestic violence was adequately presented to jurors. (ER 22.) It wrote elsewhere in its opinion that the post-conviction court was correct to hold that "there was no evidence of domestic abuse between McGill and Hardesty." (ER 16.)

### 2.    McGill was prejudiced by counsel's failures.

"[D]eficient performance and prejudice questions may be closely related," particularly where deficient performance relates to counsel's failure to investigate and present mitigation in a capital sentencing. *Correll*, 539 F.3d at 951 (citations omitted). McGill has presented evidence of significant, humanizing mitigation

information that was never investigated or presented—or explained—at sentencing. This evidence may have warranted leniency, and is at least enough to undermine confidence in McGill's death sentence; that is, there is a reasonable probability that at least one juror might have voted for life "if competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 399; *see also Sears*, 561 U.S. at 954-55.

Prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

The reviewing court evaluates the "totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Wiggins*, 539 U.S. at 536 (citing *Williams*, 529 U.S. at 397-98). Here, counsel's deficient performance rendered the proceeding unreliable and undermines confidence in the outcome. Had counsel conducted a reasonable investigation, she would have discovered extensive compelling mitigation evidence. (*See* Statement of the Case, *supra*.) Had she consulted with appropriate experts and presented them to the jury,

65

she could have properly contextualized McGill's life, prompting at least one juror to vote for life. *See Caro*, 280 F.3d at 1255.

The intersection of McGill's mental-health impairments, childhood trauma (including sexual assault), the domestic violence he experienced, and his substance addiction combine to provide substantial and powerful evidence that gives context and explanation for the crime that occurred. It also provides context for McGill's relationship with Hardesty that would have helped jurors understand why McGill stayed in the relationship which caused this crime. This humanizing evidence is enough to undermine confidence in the verdict.

McGill was prejudiced because trial counsel did not adequately present and explain how his mother's lack of nurturing and repeated abandonment traumatized him and shaped his relationships throughout his life. Jurors also did not hear testimony describing McGill's sexual assault, which occurred during a period of abandonment by his mother, and did not hear from experts explaining these experiences' effects on his behavior and mental processes. (ER 340, 361-63.) Had jurors heard about McGill's childhood sexual assault and its ramifications, there is a reasonable probability at least one would have voted for life. *See, e.g., Wharton*, 765 F.3d at 978. The Supreme Court has specifically pointed to sexual abuse as the type of "powerful" evidence which prejudices a petitioner where not presented. *Wiggins*, 539 U.S. at 534-35.

66

McGill has been diagnosed with PTSD as a result of this sexual assault. (ER 195, 154, 150.) He suffers from intrusive experiences like nightmares and flashbacks, and has attempted to suppress the painful thoughts and memories. (ER 152-54; ER 1571.) This has affected McGill in numerous ways, and his behavior throughout life and at the time of the crime is linked to this trauma and resulting PTSD.

McGill's dysfunctional childhood resulted in a tendency for him to tolerate dysfunction in adult relationships, because the dysfunction was not obvious to him based on his experiences. (ER 1742.) McGill's childhood trauma, including abandonment by his mother and his sexual assault, created lifelong difficulties with interpersonal relationships. He is easily drawn in, and feels responsible for other people's happiness. (ER 1745, 1747.) He believes that if someone is struggling, it is his responsibility to fix it, and he will do virtually anything to gain approval. (ER 1746.) He has features of borderline personality, including codependent relationships. (ER 1740, 1743-47.) His relationship with Hardesty exemplified this.

A substance addiction expert could have explained to jurors that McGill's addiction was an attempt to self-medicate the pain resulting from his sexual assault and other childhood trauma. (ER 1741, 1744, 1747-48; ER 1750.) That addiction exacerbated and created further problems, including impulsivity and a lack of

67

consideration of consequences. (ER 1747.) His PTSD amplified this addiction and codependence, leading to desperation to make relationships work. (ER 1745.) Research demonstrates that children who grow up in traumatic family environments are at increased risk for developing substance abuse. (ER 1744.) His father's substance addiction increased this risk.

McGill presented evidence during post-conviction proceedings that corroborates Lanyon's trial testimony regarding his frontal-lobe dysfunction and impairment in language and symbolic skills. Wu testified that abnormalities on the PET scan verified Lanyon's conclusions (ER 205-08, 209-15), which would have been significant at trial given the State's devastating cross-examination of Lanyon. (ER 409-10.) Dr. Rosengard also provided information regarding the effects of the combination of neurocognitive damage, emotional trauma, substance abuse, and McGill's susceptibility for dysfunctional relationships. (ER 259.)

While jurors heard some about McGill's life history and resulting impairments, the gap between what jurors heard and what could have been presented was stark. *See* Statement of the Case, *supra*. Jurors did not hear potentially determinative mitigating evidence. *Allen*, 366 F.3d at 851; *Summerlin*, 427 F.3d at 635. This is important given the prosecutor's efforts to emphasize that McGill's childhood and other mitigation were not that negative, (*see, e.g.*, ER 783-85), and to claim that McGill's childhood trauma no longer affected him as an adult

68

(*see, e.g.*, ER 401-03.) The district court's order ignored these efforts by the State. (ER 4-50.)

Because trial counsel did not investigate and present evidence of McGill's PTSD, the prosecutor was able in closing to argue that McGill showed no evidence of a mental disease or defect. (ER 1686-88.) Because an expert did not explain the control inherent in domestic violence to jurors, the prosecutor imputed Hardesty's violence as reflecting McGill. (ER 1689-91.) Because trial counsel did not properly investigate and present evidence of McGill's substance addiction, the prosecutor was able to say that McGill "may" have been under the influence of methamphetamine; but his judgment was not impaired.[22] (ER 401.) Because the jury did not have the context of the inexorable forces that impaired McGill's decision-making abilities and shaped his perception of the world, the prosecutor could in closing frame McGill as "depraved" and "dangerous," (ER 404), acting with unimpaired mind (ER 402-03).

Though counsel presented some of McGill's history to jurors, "without further investigation and presentation of contextual evidence and argument, such facts served only to demonize [petitioner] rather than to mitigate the

---

[22] The district court based its conclusion on its finding that "the jury was fully aware that McGill abused methamphetamine and was impaired at the time of the crimes." (ER 26.) This is untrue, as the prosecutor continued to insinuate at closing that this was unknown. (ER 401.)

appropriateness of imposing the death penalty for his actions." *Lambright*, 490 F.3d at 1120 (quoting *Correll v. Ryan,* 465 F.3d 1006, 1015 n. 5 (9th Cir. 2006)); *Stankewitz*, 365 F.3d at 716.

The un-presented evidence, coupled with the trial evidence, is the type of evidence that, as a matter of law, if properly presented and argued, could have persuaded a reasonable sentencer to impose life. *See, e.g.*, *Wiggins*, 539 U.S. at 534-35; *Robinson v. Schriro*, 595 F.3d 1086, 1110-11 (9th Cir. 2010). The "most likely" evidence to sway a sentencer is humanizing, "the type that would portray [petitioner] as a person whose moral sense was warped by abuse, drugs [or] mental incapacity." *Correll*, 539 F.3d at 946 (internal quotation omitted). Evidence that a defendant suffers from these challenges presents a coherent picture of the circumstances that led to his criminal acts. *See Sears*, 561 U.S. at 951. The district court erred in finding the new evidence would not have altered the sentencing profile at trial, dismissing the new evidence as cumulative or unsubstantiated. (ER 30.)

This Court must analyze how the evidence bears on the "development of the person who committed the crime," *Ainsworth*, 268 F.3d at 878, and how it "might well have influenced the [sentencer's] appraisal of . . . moral culpability." *Williams*, 529 U.S. at 398. When assessing counsel's conduct, and that conduct's effect on reliability, counsel's deficiencies and resulting prejudice must be "viewed as a

70

whole and cumulative of mitigation evidence presented originally." *Id*. at 399, *see also id.* at 397; *Strickland*, 466 U.S. at 695; *White*, 895 F.3d at 671.

Here, the abundance of compelling mitigation evidence never presented undermines confidence in the sentence. Had counsel adequately investigated mitigation, jurors would "have been faced with a strikingly different and more accurate picture" of McGill's life. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir. 2006). Had counsel performed adequately, it would have substantially "altered the sentencing profile presented" to jurors. *Strickland*, 466 U.S. at 700. There is a reasonable probability that at least one juror would have voted for life. *See Bemore*, 788 F.3d at 1176. McGill is entitled to relief.

*UNCERTIFIED ISSUES[23]*

**II. MCGILL RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE AGGRAVATION PHASE OF HIS CAPITAL SENTENCING BECAUSE HIS COUNSEL FAILED TO EFFECTIVELY INVESTIGATE AND CHALLENGE THE PRIOR SERIOUS OFFENSE AGGRAVATING FACTOR ALLEGED BY THE STATE.[24]**

---

[23] McGill raises these issues pursuant to Ninth Circuit Rule 22-1(e), allowing a petitioner to brief uncertified issues "if a petitioner concludes during the course of preparing the opening brief, that an uncertified issue should be discussed in the brief." In such cases, uncertified issues "will be construed as a motion to expand the [certificate of appealability ("COA")] and will be addressed by the merits panel to such extent as it deems appropriate." *Id*. McGill respectfully requests that the Court issue a COA as to each of these issues and decide them on the merits.

[24] McGill specifically urges the Court to grant a COA on this claim, because consideration of this aspect of his capital-sentencing proceeding should be combined with the Court's consideration of Claim One. *See White*, 895 F.3d at 645 n.1.

McGill's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated by the ineffective assistance of his counsel at sentencing. The state court's denial of this claim was based on unreasonable factual determinations. 28 U.S.C. § 2254(d)(2). The district court erred in denying this claim, and McGill is entitled to relief.

**A.      The state court made objectively unreasonable factual determinations in denying McGill's claim that his counsel provided ineffective assistance during the sentencing phase of trial.**

The state court based its determination that trial counsel was reasonable and that McGill could not show prejudice on two unreasonable factual determinations. Pursuant to 28 U.S.C. § 2254(d)(2), if this Court finds that any one of these factual determinations is unreasonable in light of the evidence presented in state court, this Court's review of McGill's claim is de novo.

At trial, the State alleged that McGill was eligible for the death penalty under the prior serious offense aggravating circumstance based on McGill's prior armed robbery convictions. (ER 991.) During state post-conviction proceedings, McGill asserted that trial counsel was ineffective in failing to investigate and challenge the sufficiency and weight of this aggravator (ER 346-48), and that counsel unreasonably failed to obtain evidence and experts corroborating McGill's brain injury and cognitive dysfunction (ER 346-48).

The state court denied this claim, stating that McGill "recounted his prior

72

crimes in detail on cross-examination." (ER 88.) Respondents and the district court concede that McGill did not testify at trial and was not subject to cross-examination. (*See* ER 31.) The state-court ruling that McGill testified at trial, and that his testimony somehow undermined this claim, was objectively unreasonable and satisfies McGill's burden under 28 U.S.C. § 2254(d)(2).

Additionally, the state court unreasonably determined that McGill's claim that the weight or severity of his prior convictions could have been minimized by evidence corroborating his brain injury was unsubstantiated. (ER 87; ER 346-48.) The state court's determination ignored substantial evidence McGill presented during post-conviction proceedings. McGill provided evidence of frontal-lobe dysfunction and an explanation for how this dysfunction, when combined with emotional trauma and substance abuse, contributed to his thinking and conduct. The PET scan performed by Dr. Wu verified Dr. Lanyon's conclusion that McGill suffered from frontal-lobe dysfunction and impairment in language and symbolic functioning. (ER 260-72; *see also* ER 204-15.) Further, Dr. Rosengard provided information regarding the effects of neurocognitive damage when combined with the emotional trauma and substance abuse that McGill experienced. (ER 259.) The state court's determination that McGill failed to substantiate this claim was objectively unreasonable and satisfies McGill's burden under 28 U.S.C. § 2254(d)(2).

73

In reviewing this claim, the district court further erred. The court correctly stated that McGill was not actually armed during the robberies, but cited Brewer's trial testimony for that fact. (ER 14.) The transcript of Brewer's testimony, however, does not reflect that information. (ER 479-80 (stating that McGill "put his hand in his jacket and told somebody that he wanted all the money because he had a gun").) While counsel asked her about the term "criminal simulation," she was not asked about how that applied to this case or whether McGill in fact used a weapon during the robberies. (ER 479-80.) The district court's error contributes to its inaccurate analysis of this claim by crediting counsel with providing information to the jury that it did not have.

**B.      Trial counsel performed deficiently at the aggravation phase by failing to challenge the prior serious offense aggravator.**

Capital defense counsel have the duty to contest aggravating factors the State alleged against their client. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *White*, 895 F.3d at 664, 666; *Correll v. Ryan*, 539 F.3d 938, 947-48 (9th Cir. 2008); 2003 ABA Guidelines §§ 10.11(A), (H), (I); *see also Wiggins*, 539 U.S. at 524. Counsel's duty to investigate and challenge the alleged aggravators also requires that counsel investigate and present evidence mitigating a prior conviction aggravating factor. *See Summerlin*, 427 F.3d at 641-43.

At McGill's sentencing, counsel failed to present evidence mitigating this aggravator. Trial counsel knew that McGill was intoxicated and unarmed at the

74

time he committed the robberies, but failed to present this information to the jury in any compelling way. (*See* ER 479; ER 399.) Additionally, counsel performed deficiently in unreasonably failing to investigate information that could be used to mitigate the convictions. *See Correll*, 539 F.3d at 947-48; *Summerlin*, 427 F.3d at 641-43; 2003 ABA Guidelines §§ 10.11(A), (H), (I).

### C. McGill was prejudiced by trial counsel's failure to effectively investigate and challenge the prior serious offense aggravator's weight and should be granted relief.

In a capital sentencing, the inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Here, the circumstances of the robberies and McGill's psychological impairments would have demonstrated that McGill's prior offenses should be given minimal or no weight. As a result of counsel's failure to challenge the aggravator, the State was able to argue without opposition that the prior offenses should be given "great weight" because they showed that McGill "was willing to threaten to take an individual's life for a small amount of money." (ER 399, 405-06.) Given the significant mitigating evidence discussed *supra*, there is a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating circumstances here did not warrant death, undermining the reliability of his sentence. *See Strickland*, 466 U.S. at 695; *Summerlin*, 427 F.3d

75

at 641-43. Because counsel provided constitutionally ineffective assistance of counsel, McGill's rights under the U.S. Constitution were violated, and McGill is entitled to relief.

### III. MCGILL RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL BECAUSE HIS COUNSEL FAILED TO OBTAIN AND PRESENT TESTIMONY FROM AN EXPERT ARSON INVESTIGATOR TO CHALLENGE THE STATE'S WITNESSES AND ARGUMENTS.

McGill's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated by the ineffective assistance of his counsel in failing to use an arson expert to investigate and challenge the State's witnesses. This claim was not raised in state court due to the ineffective assistance of McGill's state post-conviction attorney. *Martinez v. Ryan*, 566 U.S. 1 (2012). The district court erroneously held that this claim was not "substantial," and thus McGill could not satisfy the strictures of *Martinez* to overcome this claim's procedural default. (ER 65.)

Whether McGill put styrofoam into the gasoline used in the crime was of great significance during trial. According to the Arizona Supreme Court, "McGill had added pieces of a styrofoam cup to the gasoline to create a napalm-like substance that would stick to his victims and cause them more pain." *McGill*, 140 P.3d at 934. There was no evidence presented at trial that substantiated this finding, and McGill's counsel failed to challenge this damaging assertion.

76

Although police never found any physical evidence of styrofoam during their investigation, the possibility was repeated frequently throughout trial. (*See, e.g.*, ER 1251; ER 1158; ER 1097; ER 1072-75.) Counsel did not present any evidence to undermine these witnesses' credibility or to establish the lack of evidence regarding the presence of styrofoam.

### A. Counsel performed deficiently by failing to obtain necessary information for her potential expert, and by failing to challenge the testimony of the State's arson investigator.

Schaffer's file illustrates her deficient performance. She asked John Dehaan, a criminalist, to review the Phoenix Police Department's fire investigation. (ER 155-156.)[25] Dehaan's preliminary report identified numerous omissions from the arson investigator's report and stated that the report "included little detail of the type usually of concern to a fire investigator." (ER 156.) He further noted that there was no information on the material content of the victims' clothing, and that the clothing had not been tested for styrene plastic. (ER 157.) Dehaan requested thirteen different types of information he needed to complete his report, and asked Schaffer to call him to discuss obtaining the information. (ER 158.) Schaffer's file reveals that she emailed the prosecutor requesting this information (ER 160), but

---

[25] The district court denied McGill's motion to expand the record to include this document. (ER 54-73.) Because this claim was not raised in state court due to ineffective assistance of post-conviction counsel, the federal courts review the claim de novo and can consider evidence outside the state-court record. *See Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015).

there is no indication that the prosecutor responded and the requested information is not in the file. Schaffer could not have made a reasonable tactical decision not to question the State's evidence regarding the presence of styrofoam in the gasoline, because it was based on inadequate investigation. Dehaan did not testify at trial, and counsel presented no experts challenging the State's arson experts.

Schaffer's failure to challenge the State's arson investigator's testimony regarding the gasoline mixture constitutes deficient performance. *See United States v. Tucker*, 716 F.2d 576, 586 (9th Cir. 1983) (counsel's lack of preparation for trial and her failure to adequately test the State's evidence during trial reflected a failure to exercise the skill, judgment, and diligence of a reasonably competent criminal defense attorney). The State presented evidence from at least two witnesses that Dehann could have undermined: an arson investigator and a criminalist. (ER 1125-59; ER 1083-97.) These issues should have been addressed in cross-examination and explained by a defense expert. Counsel should have stressed the fact that there was no physical evidence documenting the use of styrofoam during the crime. This discrepancy goes to the heart of the prosecution's case and such a blatant inconsistency raises doubt regarding the accuracy of the State's evidence and the credibility of its witnesses. The lingering doubts regarding the presence of styrofoam in the gasoline was extremely prejudicial to McGill at sentencing.

**B.     McGill was prejudiced by counsel's failure to obtain necessary information for her potential expert, and by her failure to adequately challenge the testimony of the State's arson investigator and criminalist.**

Jurors' questions make clear that they were interested in whether styrofoam was in the gasoline. (*See, e.g.*, ER 1158; ER 1097.) The testimony about the alleged effects of such a mixture was highly prejudicial. (*See, e.g.*, ER 1200-01 (the mixture would have a "napalm" effect because the gasoline would stick to the person it was thrown onto); ER 1078 (the mixture would burn hotter, be harder to put out than regular gasoline, and be thicker).) Schaffer's failure to challenge these statements, to highlight the lack of evidence supporting them, and to challenge the credibility of the State's witnesses resulted in the jury hearing graphic details of McGill's purported attempt to increase the victims' suffering.

The effect of this prejudicial information is clear. The jury found that the crime was especially cruel, and that it was heinous and depraved. (ER 147.) The Arizona Supreme Court highlighted this in independently reviewing McGill's sentence, stating in its cruelty analysis: "McGill enhanced Perez's suffering by concocting a napalm-like mixture of gasoline and styrofoam intended to stick to his victims and make it more difficult for rescuers to put out the fire." *McGill*, 140 P.3d at 938. Considering that there is no physical evidence of styrofoam and that the State could not prove it was used, this evidence had a devastating effect on McGill's sentence. Schaffer's failure to adequately present information from an

79

expert regarding the styrofoam and to challenge the credibility of the State's witnesses undermines confidence in McGill's sentence and raises the possibility that at least one juror may have voted for life had she done so.

This claim is substantial—that is, it has "some merit." *Martinez*, 566 U.S. at 14. State post-conviction counsel acted unreasonably and prejudiced McGill in failing to raise this claim, given the significance of styrofoam to McGill's sentence and counsel's clear failure to investigate it. McGill has shown cause and prejudice to excuse the procedural default, and is entitled to have this claim heard. McGill's rights under the U.S. Constitution were violated, and he deserves relief.

## IV. THE APPLICATION OF ARIZONA'S DEATH-PENALTY STATUTE TO MCGILL VIOLATED THE EX POST FACTO CLAUSE OF THE U.S. CONSTITUTION.

McGill's rights under the U.S. Constitution's Ex Post Facto Clause were violated when the State applied a statute enacted after the crime at issue against him. *See* U.S. Const. art. I, § 10, cl. 1. The Arizona Supreme Court's denial of this claim was contrary to, and involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court. *See* 28 U.S.C. § 2254(d)(1). The district court likewise erred when it denied this claim on the merits. (ER 43.)

Article I, § 10 of the U.S. Constitution prohibits ex post facto laws. U.S. Const. art. I, § 10, cl. 1. The U.S. Supreme Court has noted that "almost from the

outset, we have recognized that central to the ex post facto prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" *Miller v. Florida*, 482 U.S. 423, 430 (1987) (abrogated by *Peugh v. United States*, 569 U.S. 530, 541 n.4) (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)).

*Miller* established three factors to determine whether a law's application violates the Ex Post Facto Clause, asking whether (1) the law is retrospective, meaning that it "appl[ies] to events occurring before its enactment"; (2) the law disadvantages the defendant; and (3) the new law results in a substantive change, affecting "'substantial personal rights.'" *Id.* at 430 (quoting *Dobbert v. Florida*, 432 U.S. 282, 293 (1977)). In *Peugh*, 569 U.S. at 541 n.4, the Court noted that *Miller* was correctly decided, but rejected *Miller*'s "substantial disadvantage" element in favor of "whether the change in law creates a ''sufficient or 'significant' risk of increasing the punishment for a given crime." (quoting *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995)). Though the Court first discussed "sufficient risk" in *Morales*, it did not wholly displace "substantial disadvantage" for a number of years. *See, e.g.*, *Lynce v. Mathis*, 519 U.S. 433, 441 (1997). While *Peugh* eventually clarified that "sufficient risk" is the correct element, *Peugh* did not invalidate *Miller* and subsequent "substantial disadvantage" cases. 569 U.S. at 541 n.4.

81

All three factors apply here. This Court should grant relief under § 2254(d)(1) because the Arizona Supreme Court's decision was both contrary to, and an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 404-07. Application of Arizona's death-penalty statute which did not exist at the time of McGill's crime to McGill was contrary to the rule and conclusions articulated in *Miller, Dobbert,* and *Morales*.

On June 24, 2002, the U.S. Supreme Court invalidated Arizona's death-penalty statute after finding that it unconstitutionally permitted the judge, rather than the jury, to find facts making a defendant eligible for the death penalty. *Ring v. Arizona*, 536 U.S. 584 (2002). The Arizona legislature did not amend its death-penalty statute to comply with *Ring* until August 1, 2002. *See* Arizona Laws 2002, 5th S.S., Ch.1, § 3. Accordingly, for a period of thirty-eight days in June and July 2002, Arizona had no death-penalty statute in effect.

The homicide in this case occurred on July 13, 2002, during that specific time. (ER 1735.) Therefore, the application of the newly-enacted capital sentencing statute to McGill was retrospective, applying to events occurring before its enactment. *See Miller*, 482 U.S. at 430. Application of the new death-penalty statute disadvantaged McGill by increasing the punishment that McGill could receive.

The enactment of a new death-penalty statute was also a substantive change

82

in the law. A change in law is deemed "substantive," if it "change[s] the quantum of punishment attached to the crime." *Id.* at 430 (quoting *Dobbert*, 432 U.S. at 293-94). Here, the newly enacted death-penalty statute changed the "quantum" of punishment attached to the crime of homicide, because the death penalty was not an available punishment and the maximum sentence available was life imprisonment without possibility of parole at the time of the crime.

Additionally, the Arizona Supreme Court's summary denial of McGill's claim cited *State v. Ring*, 65 P.3d 915 (Ariz. 2003), which discussed application of the U.S. Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584. *McGill*, 140 P.3d at 945. In *State v. Ring*, the Arizona Supreme Court considered whether Arizona's August 1, 2002 capital sentencing statute could constitutionally be applied to defendants who had already been sentenced to death under Arizona's previous version of the statute and had matters pending on direct appeal. *Ring*, 65 P.3d at 924-25. Application of this precedent to McGill's case was an unreasonable application of federal law. McGill's situation is distinct and was not addressed by this case or any cases cited therein. *See McGill*, 140 P.3d at 945 (citing *Ring*, 65 P.3d at 928); *Ring*, 65 P.3d at 924-25, 927-28 (citing cases).

Here, Arizona did not have a valid death-penalty statute in effect at the time of the homicide at issue. In McGill's unique circumstances, the question is not whether the U.S. Supreme Court's *Ring* decision resulted in a substantive or

procedural change in the law. Rather, at issue here is whether the state may sentence McGill to death by applying a newly-enacted statute where the maximum sentence available at the time of the crime was life imprisonment without possibility of parole. The Supreme Court's precedent is clear that the ex post facto doctrine prohibits the application of a newly enacted statute permitting greater punishment than that available at the time of the crime. *See Miller*, 482 U.S. at 430. Accordingly, the state court unreasonably applied "clearly established Federal law, as determined by the Supreme Court." *Williams*, 529 U.S. at 407.

Applying the later-enacted death-penalty statute to McGill's case, where the maximum available sentence was life at the time of the crime, disadvantaged McGill and created a significant risk of increasing the punishment for his crime, in that it increased the potential punishment to death. McGill's death sentence violates the Ex Post Facto Clause, and the Court should grant relief.

## CONCLUSION

For the preceding reasons, McGill respectfully requests that this Court reverse the district court's order denying his federal habeas corpus petition and remand the case to the district court with orders to grant the writ of habeas corpus and return his case to the state court for further proceedings. If this Court concludes that factual issues relevant to the issues herein remain unresolved, McGill requests that the case be remanded to the district court for discovery and an evidentiary

hearing.

Respectfully submitted:          October 24, 2019.


Jon M. Sands
Federal Public Defender
District of Arizona

Jennifer Y. Garcia
Sara Chimene-Weiss

s/Jennifer Y. Garcia
Attorney for Petitioner-Appellant

85

## STATEMENT OF RELATED CASES

I certify that there are no cases pending before this Court that are related to this case within the meaning of 9th Cir. R. 28-2.6.

s/Jennifer Y. Garcia
Attorney for Petitioner-Appellant

86

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS**

**9th Cir. Case Number(s):** 19-99002

I am the attorney or self-represented party.

**This brief contains 19,255 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ X ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/Jennifer Y. Garcia        **Date:** October 24, 2019