**No. 19–99002**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Leroy McGill,

       Petitioner-Appellant,

–vs–

David Shinn, et al.,

       Respondents-Appellees.

**On Appeal from the United States District Court for the District of Arizona**

No. CV–01149–JJT

## RESPONDENTS-APPELLEES' ANSWERING BRIEF

Mark Brnovich
Attorney General
(Firm State Bar No. 14000)

Lacey Stover Gard
Chief Counsel

Erin D. Bennett
Assistant Attorney General
Capital Litigation Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542–4686
Erin.Bennett@azag.gov
CLDocket@azag.gov
State Bar Number 27078

Attorneys for Respondents-Appellees

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES .............................................................. ii

STATEMENT OF JURISDICTION .................................................... 1

CERTIFIED ISSUE PRESENTED FOR REVIEW .............................. 2

UNCERTIFIED ISSUES PRESENTED FOR REVIEW ........................ 2

STATEMENT OF THE CASE ........................................................... 3

SUMMARY OF ARGUMENT ..........................................................10

STANDARD OF REVIEW UNDER AEDPA .......................................11

ARGUMENT...................................................................................17

    THE DISTRICT COURT CORRECTLY HELD THAT THE STATE COURT REASONABLY DETERMINED THAT MCGILL'S PENALTY-PHASE COUNSEL WERE NOT CONSTITUTIONALLY INEFFECTIVE IN INVESTIGATING AND PRESENTING MITIGATION EVIDENCE .......................................17

CONCLUSION ...............................................................................64

STATEMENT OF RELATED CASES ................................................65

CERTIFICATE OF COMPLIANCE ...................................................66

CERTIFICATE OF SERVICE...........................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aiken v. Blodgett*, 921 F.2d 214 (9th Cir. 1997) ...................................................... 5

*Babbit v. Calderon*, 151 F.3d 1170 (9th Cir. 1998) ...................................53, 55, 61

*Bell v. Cone*, 535 U.S. 685 (2002)...................................................................13, 14

*Bible v. Ryan*, 571 F.3d 860 (9th Cir. 2009) ........................................................... 63

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ...........................................................39, 40

*Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995) .................................................... 63

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)......................................................... 16

*Brewer v. Hall*, 378 F.3d 952 (9th Cir. 2004)....................................................... 12

*Brown v. Ornoski*, 503 F.3d 1006 (9th Cir. 2007) ................................................. 63

*Brown v. Payton*, 544 U.S. 133 (2005).................................................................. 14

*Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994).................................................... 25

*Carey v. Musladin*, 549 U.S. 70 (2006)................................................................. 12

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) .................................................. 5

*Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003) ................................................... 12

*Coleman v. Calderon*, 150 F.3d 1105 (9th Cir. 1998) ........................................... 25

*Cook v. Schriro*, 538 F.3d 1000 (9th Cir. 2008) .................................................... 12

*Cooper v. Calderon*, 255 F.3d 1104 (9th Cir. 2001).............................................. 26

*Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008)...................................................... 46

*Cox v. Ayers*, 613 F.3d 883 (9th Cir. 2010) .....................................................60, 61

*Cullen v. Pinholster*, 563 U.S. 170 (2011)..................................................... Passim

*Delgadillo v. Woodford*, 527 F.3d 919 (9th Cir. 2008)....................................10, 11

*Early v. Packer*, 537 U.S. 3 (2002) ....................................................................... 14

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005).................................................... 11

*Gerlaugh v. Stewart*, 129 F.3d 1027 (9th Cir. 1997) ............................................. 63

*Greiner v. Wells*, 417 F.3d 305 (2nd Cir. 2005) .................................................... 43

*Harrington v. Richter*, 562 U.S. 86 (2011) ..............................................13, 27

*Harris v. Vasquez*, 949 F.2d 1497 (9th Cir.1990) ................................................. 50

*Henyard v. McDonough*, 459 F.3d 1217 (11th Cir. 2006) ..............................54, 55

*Jackson v. Calderon*, 211 F.3d 1148 (9th Cir. 2000) ........................................... 25

*Jackson v. Virginia*, 443 U.S. 307 (1979)........................................................... 5

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ...................................................... 27

*Kornahrens v. Evans*, 66 F.3d 1350 (4th Cir. 1995) ........................................53, 55

*LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir. 1998) ............................................ 24

*Lambert v. Blodgett*, 393 F.3d 943 (9th Cir. 2004)............................................. 11

*Lindh v. Murphy*, 521 U.S. 320 (1997)................................................................ 11

*Lockyer v. Andrade*, 538 U.S. 63 (2003) ............................................................. 13

*Marshall v. Lonberger*, 459 U.S. 422 (1983) ...................................................... 34

*Matthews v. Evatt*, 105 F.3d 907 (4th Cir. 1997).................................................. 53

*Matylinsky v. Budge*, 577 F.3d 1083 (9th Cir. 2009) ............................................ 61

*Michel v. Louisiana*, 350 U.S. 91 (1955)............................................................. 25

*Mickey v. Ayers*, 606 F.3d 1223 (9th Cir. 2010) ................................................... 56

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) .............................................30, 31, 56

*Mitchell v. Esparza*, 540 U.S. 12 (2003) ............................................................. 14

*Morris v. Slappy*, 461 U.S. 1 (1983)................................................................... 41

*Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001)......................................... 24

*Newland v. Hall*, 527 F.3d 1162 (11th Cir. 2008)................................................ 53

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ........................................................... 24

*Plumlee v. Masto*, 512 F.3d 1204 (9th Cir. 2008)................................................ 41

*Purkett v. Elem*, 514 U.S. 765 (1995)................................................................... 5

*Rice v. Collins*, 546 U.S. 333 (2006)..............................................................14, 34

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................. 48

iii

*Runningeagle v. Ryan*, 686 F.3d 758 (9th Cir. 2012)................................................ 5

*Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990) ...................................................... 50

*State v. McGill*, 140 P.3d 930, ¶¶ 2–8 (2006)................................................4, 7, 46

*State v. Rienhardt*, 951 P.2d 454 (1997)................................................................ 62

*Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193 (11th Cir. 2007)......................... 54

*Strickland v. Washington*, 466 U.S. 668 (1984)..............................................Passim

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005)............................................. 41

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ............................................Passim

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...........................................................39, 40

*Williams v. Head*, 185 F.3d 1223 (11th Cir. 1999)............................................... 43

*Williams v. Taylor*, 529 U.S. 362 (2000)............................................................... 12

*Wilson v. Greene*, 155 F.3d 396 (4th Cir. 1998)................................................... 50

*Wong v. Belmontes*, 558 U.S. 15 (2009)......................................................60, 61, 63

*Wood v. Allen*, 558 U.S. 290 (2010)...........................................................11, 13, 14

*Woodford v. Garceau*, 538 U.S. 202 (2003)......................................................... 11

*Woodford v. Visciotti*, 537 U.S. 19 (2002)......................................................... 5, 27

*Woods v. Donald*, 575 U.S. 312 (2015)................................................................. 13

**Rules**

9th Cir. R. 28–2.6 ................................................................................................... 67

9th Cir. R. 32–1 ...................................................................................................... 66

Fed. R. App. P. 4(a) .................................................................................................. 1

Fed. R. Civ. P. 54(a) ................................................................................................. 1

Fed. R. Civ. P. 58..................................................................................................... 1

**Statutes**

28 U.S.C. §1291 .............................................................................................. 1

28 U.S.C. § 2253 ............................................................................................. 1

28 U.S.C. § 2254 ..................................................................................... Passim

A.R.S. § 13–703(G)(1) .................................................................................. 62

A.R.S. § 13–751(F) .......................................................................................... 6

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. On January 10, 2019, the district court entered its order denying the petition, which was a final order under Rules 54(a) and 58 of the Federal Rules of Civil Procedure. On February 4, 2019, McGill filed a notice of appeal that was timely under Rule 4(a) of the Federal Rules of Appellate Procedure. On January 10, 2019, the district court granted a certificate of appealability as to Claim 1. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## CERTIFIED ISSUE PRESENTED FOR REVIEW

1. Did the district court correctly conclude that the state court reasonably determined that McGill's counsel were constitutionally effective at the penalty phase of his capital trial in investigating and presenting mitigation?

## UNCERTIFIED ISSUES PRESENTED FOR REVIEW[1]

2. Did the district court correctly conclude that the state court reasonably determined that McGill's counsel were constitutionally effective at the aggravation phase of his capital trial by not minimizing McGill's prior convictions for armed robbery?

3. Did the district court correctly conclude that the state court reasonably determined that McGill's counsel were constitutionally effective in the guilt phase of his capital trial for forgoing the retention of an expert arson investigator?

4. Does application of Arizona's death penalty statute violate the federal constitutional prohibition against *ex post facto*?

---

[1] Respondents respectfully decline to respond to the uncertified issue unless and until this Court orders them to do so. *See* Fed. R. App. P., Cir. R. 22–1(f).

**STATEMENT OF THE CASE**

**A.     THE CRIMES.**

The Arizona Supreme Court summarized the facts underlying McGill's convictions as follows:

> In July 2002, thirty-nine-year-old Leroy McGill was living in Sophia Barnhart's house. His girlfriend, Jonna "Angel" Hardesty, also lived there, as did Justin Johnson and Barnhart's oldest son, Dean. Jack Yates had a small one-bedroom apartment in a duplex within walking distance of Barnhart's home. Hardesty's brother, Jeff Uhl, sometimes stayed in Yates' apartment. Eddie and Kim Keith, along with their two daughters, also stayed with Yates, as did Charles Perez and his girlfriend, Nova Banta. Yates had his own bedroom, and the others slept in a common room that also served as kitchen and living room.
>
> Perez and Banta had recently accused McGill and Hardesty of stealing a shotgun from the Yates apartment. This accusation exacerbated an already contentious relationship between Banta and Hardesty.
>
> On July 12, 2002, McGill, Hardesty, Barnhart, and Johnson spent the evening at Barnhart's house smoking marijuana purchased from Perez. At approximately 3:30 a.m. on July 13, McGill went to Yates' apartment. Uhl and Eddie Keith came out of the apartment to talk with McGill. McGill told Keith to get his wife and children out of the apartment because he "was going to teach [Perez] and [Yates] a lesson, that nobody gets away with talking about [McGill and Hardesty]." In response to Keith's pleading, McGill agreed to spare Yates, but said it was too late for Perez. McGill also told Keith that he "was the only one who knew about it and that if anybody said anything about it, that [McGill] would know who said it," then remarked that Keith "had pretty little girls." Keith and his family fled the apartment.

**3**

Uhl admitted McGill into the apartment shortly thereafter. Perez and Banta were sitting next to each other on a couch that was next to the front door. Yates was also inside and either lying down on another couch or in his bedroom. Banta testified that McGill "turned around and looked at me and [Perez] and said [Perez] shouldn't talk behind other people's backs, and he poured the gasoline on us and quickly lit a match and threw it at us." McGill had added pieces of a styrofoam cup to the gasoline to create a napalm-like substance that would stick to his victims and cause them more pain. Perez and Banta, both engulfed in flames, ran out of the apartment.

Yates and Uhl also escaped the apartment, which had caught on fire. Yates put out the flames on Banta using a blanket. Mary Near, the occupant of the other apartment in the duplex, awoke to the smell of smoke, quickly dressed, and ran from her apartment, which was also on fire. When firefighters arrived, the apartment was fully engulfed in flames.

At the hospital, Perez, screaming in pain, pleaded, "Help me, help me. Get the pain away." Burns covered eighty percent of Perez's body and caused his death on July 14, 2002. Banta was also conscious and in extreme pain; third degree burns covered approximately three-quarters of her body. At the hospital, Banta identified McGill as the person who set her on fire.

Meanwhile, at Barnhart's house, Hardesty told Johnson that McGill had just called and asked "if it smelled like burning flesh." Referring to Johnson, McGill asked Hardesty or Barnhart, "Is he going to talk?" Johnson testified that someone, either McGill, Hardesty, or Barnhart, threatened him with harm if he reported anything about the murder.

(ER[2] 91–93); *State v. McGill*, 140 P.3d 930, 933–934, ¶¶ 2–8 (2006). These

factual findings by the Arizona Supreme Court are not only entitled to

---

[2] "ER" refers to Petitioner's Excerpts of Record; "SER" refers to Respondents' Supplemental Excerpts of Record.

**4**

deference, but are also presumed correct. 28 U.S.C. §§ 2254(d)(1), (e)(1); *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam); *Runningeagle v. Ryan*, 686 F.3d 758, 763 n.1 (9th Cir. 2012) (rejecting argument that statement of facts in Arizona Supreme Court opinion should not be afforded the presumption of correctness); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Carriger v. Stewart*, 132 F.3d 463, 473 (9th Cir. 1997); *Aiken v. Blodgett*, 921 F.2d 214, 217 (9th Cir. 1997). Moreover, state courts are generally presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

### B. TRIAL.

On March 11, 2003, a Maricopa County grand jury indicted McGill with one count of first-degree murder, one count of attempted first-degree murder, two counts of arson of an occupied structure, and three counts of endangerment. (ER 1734–1737.) Originally, Bobbi Falduto of the Maricopa County Public Defender's office was appointed to represent McGill, but she was replaced by Maria Schaffer of the Office of the Legal Advocate after the discovery of a conflict. (ER 1728–1733.) Elizabeth Todd, also of the Office of the Legal Advocate, was Schaffer's co-counsel. (ER 1697–1698.)

In June 2003, the State filed a notice of intent to seek the death penalty on the first-degree murder charge, alleging three aggravating circumstances:

conviction of a prior serious offense (A.R.S. § 13–751(F)(2))[3], creating a grave risk of death to additional persons (A.R.S. § 13–751(F)(3)), and committing the murder in an especially heinous, cruel, or depraved manner (A.R.S. § 13–751(F)(6)). (ER 1725–1727.) Trial commenced October 7, 2004. (SER 1–2.) The State's witnesses included Banta, who testified regarding her extensive injuries and identified McGill as the person who threw a cup of gasoline on her and Perez and set them on fire (SER 3–26), and Johnson, who testified that McGill admitted throwing gasoline on Perez and Banta and setting them on fire (ER 1195–1196). The sole defense witness, Barnhart, claimed that McGill did not start the fire. (ER 1061–1068.) After four days of guilt-phase evidence, the jurors convicted McGill of all charges in less than one hour. (ER 983–987; SER 1–2, 27–44.) At the conclusion of the aggravation phase, the jury found beyond a reasonable doubt the existence of all three alleged capital aggravators. (ER 147; 980–982.)

During the penalty phase, McGill presented extensive mitigation evidence, including "that he had an abusive childhood; that he was psychologically immature and, as a result, his girlfriend had greater than normal influence over him; that he suffered from some degree of mental impairment;

_____

[3] The Arizona legislature recently amended and renumbered this statute. Respondents refer to the numbering in effect at the time of McGill's crimes.

**6**

that he performed well in institutional settings; and that his family cares about him." (ER 94.) *McGill*, 140 P.3d at 934, ¶ 12. The prosecution rebutted this by presenting evidence that McGill attempted to have a potential witness against him killed while awaiting trial. The State also presented a letter from Perez's sister, reading into the record, expressing the grief that Perez's family suffered as a result of his death. (ER 94.). *McGill*, 140 P.3d at 934, ¶ 12. At the end of this phase, the jury returned a verdict of death for McGill's first-degree murder conviction. (ER 407; SER 60–62.) On the non-capital counts, the trial court imposed maximum, aggravated sentences, to run concurrently with each other but consecutively to the death sentence. (SER 64–65.)

### C.   DIRECT APPEAL.

On automatic direct appeal, the Arizona Supreme Court rejected McGill's 27 claims, including 14 issues raised to avoid federal preclusion, affirming his convictions and sentences on August 14, 2006. (ER 128.) *McGill*, 140 P.3d at 946, ¶ 84. The United States Supreme Court denied certiorari review on April 2, 2007. (ER 89.) *McGill v. Arizona*, 549 U.S. 1324 (2007) (Mem.).

### D.   POST-CONVICTION PROCEEDING.

On June 1, 2010, McGill, through counsel, filed a post-conviction relief petition, raising four claims of ineffective assistance of counsel. (ER 327–363.)

The post-conviction court dismissed several claims as not colorable: that penalty-phase counsel were constitutionally ineffective for failing to call an addiction specialist; retain a domestic violence expert; adequately prepare neuropsychologist Dr. Richard Lanyon; subpoena McGill's brother, Lonnie Foster; further investigate a claim that McGill was sexually abused as a child; develop additional mitigation evidence from McGill's brothers, Cordell and Kean; and challenge the sufficiency of McGill's prior armed robbery convictions. (ER 83–88.) However, the court ordered an evidentiary hearing to address whether penalty-phase counsel were constitutionally ineffective for failing to retain "additional experts to investigate further the defendant's alleged brain damage and to corroborate Dr. Lanyon's conclusions, particularly one who could have shown a causal nexus between his impairment and the crime[.]" (ER 86, 88.)

In October 2011, the post-conviction court conducted a 2–day evidentiary hearing, during which McGill presented testimony from Dr. Lanyon, and Maria Schaffer, plus two additional expert witnesses, Drs. Joseph Wu, a psychiatrist and brain imaging expert, and Richard Rosengard, a psychiatrist. (SER 69–299.) At the conclusion of the hearing, the trial court issued a lengthy minute entry rejecting McGill's remaining ineffective assistance claims. (ER 75–82.) The Arizona Supreme Court denied review on May 30, 2012. (ER 74.)

**8**

## E. HABEAS PETITION.

On April 8, 2013, McGill filed a Petition for Writ of Habeas Corpus in the United States District Court for the District of Arizona, raising 29 claims for relief. (*See* ER 4–53.) McGill subsequently withdrew Claims 8 and 9. (*See* ER 4.) On January 9, 2019, the district court dismissed McGill's habeas petition, denied McGill's motion for evidentiary development, and granted a certificate of appealability with regard to Claim 1 regarding the constitutional effectiveness of McGill's penalty-phase counsel. (ER 53.) McGill filed a timely notice of appeal with this Court. (ER 1.)

## SUMMARY OF ARGUMENT

**THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE STATE COURT REASONABLY DETERMINED THAT MCGILL'S PENALTY-PHASE COUNSEL WERE NOT INEFFECTIVE IN THE INVESTIGATION AND PRESENTATION OF PENALTY-PHASE MITIGATION EVIDENCE.**

McGill contends that his penalty-phase counsel were ineffective because they "failed to investigate, develop, and present significant and compelling mitigation evidence." (Dkt. 13, at 44.)[4] This contention is belied by the factual record. The state court reasonably determined the facts and reasonably applied controlling Federal law, specifically *Strickland v. Washington*, 466 U.S. 668 (1984), when it held that penalty-phase counsel were not ineffective in investigating and presenting mitigating evidence. The post-conviction court correctly determined that McGill retained an addictionologist—although counsel made a strategic decision not to call him as a witness—and a neuropsychologist, who presented McGill's mitigating qualities to the jury, including his substance abuse and his relationship with his controlling and abusive girlfriend. Further, the district court correctly applied *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011), when it precluded McGill from presenting additional information that was not previously presented to the state court. Thus, the district court correctly deferred to the state courts' rulings. 28 U.S.C. § 2254(d); *Delgadillo v.*

---

[4] "Dkt." refers to this Court's docket.

**10**

*Woodford*, 527 F.3d 919, 924 (9th Cir. 2008). As such, McGill's penalty-phase counsel were not constitutionally ineffective in their investigation, development, and presentation of his mitigation.

## STANDARD OF REVIEW UNDER AEDPA

This Court reviews the district court's denial of a habeas petition *de novo* and reviews its factual findings for clear error. *See Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). And a prisoner bears the burden of proving his habeas claims. *See Lambert v. Blodgett*, 393 F.3d 943, 969, n. 16 (9th Cir. 2004).

Because McGill filed his habeas petition in 2013, the Anti-terrorism and Effective Death Penalty Act (AEDPA) governs. *Woodford v. Garceau*, 538 U.S. 202, 204 (2003); *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, a federal court "must defer to the state court's resolution of federal claims," *Delgadillo*, 527 F.3d at 924. It may not grant habeas relief unless the state-court adjudication decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). *See also Wood v. Allen*, 558 U.S. 290, 293 (2010). The Court must also presume that a state court's factual findings are correct:

**11**

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). In evaluating whether a state court decision was contrary to, or involved an unreasonable application of, federal law, or involved an unreasonable factual determination, the federal courts review the last-reasoned state court decision addressing the claim. *Cook v. Schriro*, 538 F.3d 1000, 1015 (9th Cir. 2008).

The phrase "clearly established Federal law," as set forth in 28 U.S.C. § 2254(d)(1), "refers to the holdings, as opposed to the *dicta* of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "While circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (quotations and citations omitted); *accord Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004).

"For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*,

**12**

562 U.S. 86, 101 (2011) (quotations omitted; emphasis in original); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002) (unreasonable application distinct from incorrect one). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quotations omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Rather, a prisoner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. "Adherence to these principles serves important interests of federalism and comity." *Woods v. Donald*, 575 U.S. 312, 316 (2015). And if AEDPA's "standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Similarly, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301. Reviewing a state court's factual findings under 28 U.S.C. § 2254(d)(2) requires this Court to "be particularly deferential to [its] state-court colleagues." *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d

**13**

984, 1000 (9th Cir. 2014). A prisoner must show that "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* at 1000. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] court's ... determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). Section 2254(d)(2) sets "a daunting standard—one that will be satisfied in relatively few cases." *Taylor*, 366 F.3d at 1000.

A state court decision is "contrary to" clearly established federal law when the court has applied a rule of law that contradicts the governing law set forth in Supreme Court precedent, or has encountered a set of facts that are "materially indistinguishable" from a Supreme Court decision and yet reached a different result than the Supreme Court. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005); *Cone*, 535 U.S. at 694. A state court decision need not cite or discuss applicable Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (quotations omitted); *see also Packer*, 537 U.S. at 8.

Under 28 U.S.C. § 2254(d)(2) and (e)(1), this Court "may not second-guess a state court's fact-finding process unless, after review of the state-court

record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor*, 366 F.3d at 999. Where a petitioner challenges a state court's factual findings based exclusively on the state court record, 28 U.S.C. § 2254(d)(2)'s "unreasonable determination" clause governs his claim, and requires particular deference to the state court's findings:

> What the 'unreasonable determination' clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. Similarly, before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

*Taylor*, 366 F.3d at 999–1000 (citation omitted).

"This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor*, 366 F.3d at 1000. If the state court's factual determinations survive the foregoing "intrinsic review," they "are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal court." *Id.* A federal court may only overturn these findings if a petitioner establishes, by

clear and convincing evidence, that they are erroneous. *Id.* Therefore, "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). As such, habeas petitioners are not entitled to relief "unless they can establish that it resulted in actual prejudice." *Id.* at 637.

## ARGUMENT

**THE DISTRICT COURT CORRECTLY HELD THAT THE STATE COURT REASONABLY DETERMINED THAT MCGILL'S PENALTY-PHASE COUNSEL WERE NOT CONSTITUTIONALLY INEFFECTIVE IN INVESTIGATING AND PRESENTING MITIGATION EVIDENCE.**

McGill argues that penalty-phase counsel, Schaffer and Todd, were constitutionally ineffective for failing to investigate, develop, and present additional mitigating evidence. (Dkt. # 13, at 44–78.) Specifically, he contends that counsel failed to: 1) develop a relationship of trust that would have resulted in the discovery of additional mitigating evidence, 2) obtain additional records, 3) adequately prepare expert witness Dr. Richard Lanyon, 4) discover and present additional evidence of substance abuse, domestic violence, and an alleged childhood sexual assault. (*Id.*) McGill is mistaken, and further, has established neither deficient performance nor prejudice under *Strickland*.

### A. FACTUAL AND PROCEDURAL BACKGROUND.

The district court detailed the background of this claim, and the state court's ruling. A large team of highly qualified people assisted McGill in his capital trial. Maria Schaffer and Elizabeth Todd, of the Maricopa County Office of the Legal Advocate (OLA), represented McGill. (ER 11.) The team also included OLA's investigator, Mark Mullavey, and Marianne Brewer as the team's mitigation specialist. (ER 11–12; ER 739.) Dr. Lanyon, a neuropsychologist, joined the team in evaluating McGill and testifying on his

behalf. (ER 12.) Although Schaffer sought an expert on domestic violence victimization, the Legal Advocate, Susan Sherwin, rejected the request. (ER 12.) Further, Sherwin approved Schaffer's request for an addictionologist. (ER 12.)

McGill presented 10 mitigation witnesses, including numerous family members, Mitigation specialist Brewer, and Dr. Lanyon. (ER 12.)

> Mitigation specialist Brewer testified about the results of her investigation into McGill's background, and presented several videotaped interviews, including an interview she conducted with McGill's brother Brian. Brewer also prepared an exhibit, submitted to the jury as an exhibit at sentencing, which included her interview notes and voluminous records documenting McGill's educational, medical, and legal history.
>
> Through these witnesses the jury learned about McGill's chaotic, neglectful, and abusive upbringing.

(ER 12 (internal citations omitted).)

The jury learned that McGill's mother raised McGill and his siblings essentially as a single mother, despite having other men in her life, some of whom beat McGill and his siblings. (ER 12.) McGill's father kidnapped three of his children, including McGill, taking them to California. (ER 12.) Ann did not regain custody of the children for four months. (ER 12.) McGill's mother worked long hours, often at night, leaving the McGill children unsupervised. (ER 13.)

Moreover, because the family moved frequently, McGill attended many different schools. (ER 13.) The jury heard that McGill did not do well in school

throughout his academic career. (ER 13.) "In 1971, he and Cordell were sent to Buckner's Boys' Ranch, a group home in Texas, after authorities concluded that Ann could not adequately care for her children. McGill spent two years at Buckner's before returning home." (ER 13 (internal citations omitted).) A few years later, "[i]n 1976, McGill was sent to another group home, Boysville, after being expelled from school for truancy and placed on juvenile probation. Cordell, Kean, and their half-brother, Lonnie Foster, were also at Boysville. Boysville was stricter than Buckner's." (ER 13 (internal citations omitted).) McGill left Boysville when he was 15 years old. (ER 13.) After leaving Boysville at 15 to live with family in Phoenix, McGill enrolled in high school but dropped out. (ER 13.)

> Brewer testified at length about her mitigation findings. She testified that McGill claimed to have been injured in a car accident in 1985, with his head crashing through the windshield. However, Brewer was unable to obtain any medical records documenting McGill's injuries.
>
> Brewer testified that in 1985 McGill was placed on probation for using another person's credit card. While on probation, he committed two armed robberies and was imprisoned from 1986 to 1993. McGill was not actually armed during the robberies; he put his hand in his jacket and pretended to have a gun.

(ER 13–14 (internal citations omitted).) McGill did well in prison, earning his GED, participating in AA meetings, and holding several jobs which required little to no supervision. (ER 14.)

**19**

> Counsel presented mitigating evidence about the negative influence of McGill's girlfriend, Jonna Hardesty. McGill's family believed Hardesty was "sick," "evil," and a bad influence who "called the shots" in her relationship with McGill and isolated him from the rest of his family. McGill told people that he wanted to get away from Hardesty, but did not leave because he was afraid she would retaliate by harming his family or setting fire to his apartment.
>
> Brewer testified that the instability McGill experienced as a child disrupted his learning and impaired his socialization, behavior, and self-esteem. She concluded that McGill was "severely" abused as a child.

(ER 14 (internal citations omitted).)

Dr. Lanyon also testified that he reviewed numerous records prior to evaluating McGill. (ER 14.) Dr. Lanyon "met with McGill for six or seven hours, performed a neuropsychological evaluation, and administered general psychological dysfunction tests." (ER 14.) Although Dr. Lanyon found that McGill had an average IQ, Dr. Lanyon opined that "the effects of the instability, neglect, and abuse McGill experienced as a child" had a negative effect on him. (ER 14.) Dr. Lanyon also testified about McGill's dysfunctional relationship with his girlfriend, Jonna "Angel" Hardesty. (ER 14–15.) Dr. Lanyon described Hardesty as "schizophrenic and 'actively psychotic.' McGill himself was 'pathological' enough to tolerate Jonna's bizarre behavior. The maternal neglect McGill experienced as a child led to a distorted view of interpersonal relationships with women. According to Dr. Lanyon, McGill was passive in his relationship with Jonna, and 'when she said jump, he jumped.'" (ER 14–15

(internal citations omitted).) Thus, Dr. Lanyon testified about the domestic violence that McGill endured at the hands of Hardesty.

Dr. Lanyon also explained that McGill indicated that he suffered a head injury during a car crash in 1985, although he did not have any corroborating medical records to prove the existence of such. (ER 15.) Dr. Lanyon testified that, "after the injury McGill displayed symptoms consistent with frontal lobe damage. He became apathetic, lost his motivation to work, and ended up homeless before committing the armed robberies. He also suffered depression and suicidal thoughts. McGill told Dr. Lanyon that he had no memory of the robberies." (ER 15.)

Dr. Lanyon further testified about McGill's substance abuse issues, including that McGill started consuming alcohol by the age of nine and using marijuana at 13. (ER 15.) McGill graduated to methamphetamine, using it chronically and heavily. (ER 15.) Dr. Lanyon explained that methamphetamine causes "paranoia and impaired judgment." (ER 15.)

Dr. Lanyon relayed the results of the testing that he performed on McGill. The Minnesota Multiphasic Personality Inventory (MMPI II) indicated "McGill was anxious, withdrawn, and passive." (ER 15.)

> Neuropsychological testing indicated no major difficulties due to brain impairment, with the exception of evidence of brain injury related to McGill's ability to communicate, which Dr. Lanyon described as "residual impairment of brain damage." There was no

deficit in executive functioning. Dr. Lanyon concluded that it was likely McGill had minimal frontal lobe damage affecting his motivation and drive rather than his cognition.

(ER 15.)

During closing argument, Schaffer highlighted for the jury the negative effects that McGill's upbringing had on him, leading him to become involved in the dysfunctional relationship with Hardesty. (ER 15–16.) Schaffer explained that McGill's need to protect Hardesty stemmed from—almost as a reflex— McGill's need to protect his mother. (ER 15–16.) Schaffer portrayed the circumstances as McGill being "under Hardesty's influence, and in order to protect her reputation, that he committed the crimes." (ER 16.)

At the post-conviction proceedings, McGill again was represented by counsel, who alleged multiple claims of ineffective assistance of penalty-phase counsel. (ER 16.) The post-conviction court dismissed all but one claim as not colorable. (ER 16.) The state court dismissed McGill's claims of ineffective assistance of penalty-phase counsel for failure to present an addictionologist or a domestic violence expert. (ER 16.) The post-conviction court also found that, because there was no evidence that McGill was sexually abused, counsel was not ineffective for "failing to investigate and present such evidence." (ER 16.)

After an evidentiary hearing on the remaining claim—whether penalty-phase counsel "performed ineffectively by failing to retain additional experts to

present evidence of his cognitive impairment and establish a causal nexus between that impairment and the crimes"—the post-conviction court found that penalty-phase counsel provided constitutionally effective assistance of counsel. (ER 16–17.)

> The court noted that trial counsel presented "a substantial amount of mitigation" concerning McGill's "dysfunctional family background, his relationship with Ms. Hardesty, and his substance abuse." The court explained that counsel retained Dr. Lanyon to evaluate McGill for possible brain damage, but his findings were not significant, and the new evidence from Drs. Wu and Rosengard was largely cumulative to the testimony of Dr. Lanyon. The court concluded there was not a reasonable probability that their testimony at sentencing would have produced a differen[t] outcome.

(ER 16–17 (internal citations omitted).)

The district court subsequently concluded that McGill was not entitled to habeas relief on this claim because the post-conviction relief's court decision that counsel were not ineffective "was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts." (ER 17.)

## B. CLEARLY ESTABLISHED FEDERAL LAW.

The United States Supreme Court set forth the clearly established federal law governing ineffective assistance of counsel claims in *Strickland*. To merit relief, McGill must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

produced a just result." *Strickland*, 466 U.S. at 686. He must satisfy both prongs of *Strickland*'s test by demonstrating that (1) counsel's performance was deficient under prevailing professional standards and (2) he suffered prejudice as a result. *Id.* at 687–88. "[A] court is not required to address both components of the *Strickland* test in deciding an ineffective assistance of counsel claim 'if the defendant makes an insufficient showing on one.'" *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 697).

A petitioner demonstrates deficient performance by showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 699. "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). A petitioner's allegations and supporting evidence must withstand this Court's "highly deferential" scrutiny of counsel's performance, and overcome its "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689–90. Under this deferential standard, a petitioner bears the heavy burden of showing that counsel's assistance was "neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001). Actions by counsel that "might be considered sound trial strategy" do not constitute

**24**

ineffective assistance. *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Additionally, this Court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (en banc). Rather, as *Strickland* holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Overall, this Court engages in an "extremely limited" examination of counsel's performance:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [This Court] ask[s] only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.

*Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998) (internal quotations omitted).

Even when a petitioner establishes that counsel has performed deficiently, he must still show prejudice to be entitled to relief. *Strickland*, 466 U.S. at 691–92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). This Court should not presume prejudice. *Jackson v. Calderon*,

**25**

211 F.3d 1148, 1155 (9th Cir. 2000). Rather, a petitioner must affirmatively prove actual prejudice—the mere possibility that he suffered prejudice is insufficient to establish Strickland's prejudice prong. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' . . . This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors *actually* prejudiced him.") (quoting *Strickland*, 466 U.S. at 693) (emphasis in original).

To prove prejudice, a petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Finally, in reviewing a state court's resolution of an ineffective assistance of counsel claim, this Court should consider *only* whether the court applied *Strickland* unreasonably, and should apply a "doubly deferential" standard of review:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

**26**

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quotations and citations omitted); *see also Pinholster*, 131 S. Ct. at 1403 ("We take a highly deferential look at counsel's performance, through the deferential lens of § 2254(d).") (quotations and citations omitted); *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of case in an objectively unreasonable manner.") (citations omitted); *Richter*, 562 U.S. at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so.")

## C. ARGUMENT.

McGill's penalty-phase counsel presented mitigation evidence of McGill's abusive and neglectful childhood, psychological immaturity, mental impairment, substance abuse history, and history as a victim of domestic violence. The district court did not err in rejecting McGill's ineffective-assistance-of-penalty-phase-counsel claim for failure to investigate and present adequate mitigation information because the state court's denial of this claim was not contrary to, nor

an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts. McGill ignores the plethora of mitigating evidence that counsel *did* present to the jury, and merely argues for new and/or additional mitigation evidence. Because counsel presented a "substantial amount of mitigation," McGill did not receive ineffective assistance of penalty-phase counsel, and he is not entitled to relief. (ER 81.)

### 1. *The post-conviction court reasonably determined the facts.*

As he did below, McGill continues to mischaracterize several of the post-conviction court's factual findings as unreasonable under 28 U.S.C. § 2254(d)(2) and concludes, therefore, that the post-conviction court's decision is not entitle to deference. However, McGill has not satisfied 28 U.S.C. § 2254(d)(2)'s "daunting standard," for any of the factual errors he alleges. *See Taylor,* 366 F.3d at 1000. As such, the district court correctly accorded deference to the post-conviction court's factual determinations.

### a. Substance addiction.

McGill contends that the post-conviction court unreasonably determined that Shaffer conceded that she retained addictionologist Dr. Beckson, albeit not her preferred doctor, but made a strategic decision not to present his testimony because "the defendant would not help in his own defense." (Dkt. 13, at 46–49.) McGill also contends that the state court unreasonably determined that McGill

failed to show how another expert would have testified without McGill's admission of guilt, disregarding Dr. French's findings because he failed to personally evaluate McGill. (Dkt. 13, at 49–50.) Finally, McGill asserts that the state court unreasonably found that Dr. French's testimony "would add nothing to Dr. Lanyon's testimony." (ER 86; Dkt. 13, at 50.) However, the district court did not err by concluding that the state court reasonably determined that penalty-phase counsel were not constitutionally ineffective for failing to retain and present a second addictionologist.

For example, McGill contends that Schaffer was "arbitrarily overruled" by her boss, Susan Sherwin, when actually, Sherwin concluded that an expert with different credentials was more appropriate for the case. (Dkt. 13, at 46–47; ER 218–219 ("Ms. Sherwin felt that she would give me an addictionologist for the case, but it wasn't going to be Dr. Hoyt-Croft. Ms. Sherwin's position was that she wanted a medical doctor, an M.D. addictionologist on Leroy's case.").) Further, McGill attacks the post-conviction court's finding that Schaffer "conceded that she did get an addictionologist but that she did not want to use that particular expert." (ER 80; *see also* Dkt. 13, at 47.) But this finding is consistent with Schaffer's affidavit and testimony. Schaffer stated that although her supervisor denied a request to retain Dr. Hoyt-Croft, she was authorized to retain Dr. Mace Beckson as an addiction specialist. (ER 24; ER 79; ER 199,

**29**

217–219; ER 323.) Dr. Beckson, however, concluded that, in his professional opinion, he could not help given McGill's refusal to admit culpability. (ER 24; ER 86; ER 199, 218–219, 228–229; ER 323.) Consequently, Schaffer chose not to call Dr. Beckson to testify. Therefore, the district court correctly affirmed the post-conviction court's finding that Schaffer's actions were reasonable under the circumstances.

McGill also attacks as unreasonable the state court's conclusion that Schaffer was not constitutionally ineffective for deciding not to call Dr. Beckson because McGill "would not help in his own defense." (ER 24; ER 79; Dkt. 13, at 48–49.) But this is simply another way of stating that counsel declined to call Dr. Beckson in light of his professional opinion that he could not assist without McGill's acceptance of culpability. And despite McGill's contention that Schaffer's failure to present Dr. Beckson's testimony was not a tactical decision, nothing prevented her from subpoenaing him and forcing him to testify; however, she made the strategic choice not to do so because he had indicated his testimony would not be help the defense.

McGill also cites *Milke v. Ryan*, 711 F.3d 998, 1007–08 (9th Cir. 2013), to bolster his claim. However, the evidence in *Milke* was vastly different than that presented here. In *Milke*, the trial court did not consider all of the evidence presented. 711 F.3d at 1008. Here, the post-conviction court considered all of the

evidence. There is no dispute that penalty-phase counsel retained an expert and did not call him as a witness because he "opined he could not assist in the case." (ER 323.) The post-conviction court's conclusion that Schaffer was able to retain an addiction specialist, but chose not to call that witness in light of his opinions, was reasonable. *See* 28 U.S.C. § 2254(d)(2).

McGill also argues that the post-conviction court erred by finding that he failed to show "how any other addiction specialist would have testified without this admission." (Dkt. 13, at 49; ER 86.) McGill claims that this finding was contradicted by Dr. French's letter to post-conviction counsel, which focused mostly on the general effects of methamphetamine use. (ER 304–307; *see also* ER 26.) Relying on Kean's affidavit which stated that McGill chronically used methamphetamine, Dr. Rosengard's evaluation which stated that McGill smoked methamphetamine daily until his arrest, and Dr. Lanyon's report which stated that McGill had been awake for several days when he committed the crime, Dr. French noted that methamphetamine use "may" lead to impulsive and aggressive behavior, and that sleep deprivation can exacerbate the psychotic symptoms of methamphetamine abuse. (ER 306.) Dr. French concluded that "the combination of heavy chronic methamphetamine abuse and an underlying brain injury negatively affected Mr. [Mc]Gill's cognitive abilities and control over his behavior." (ER 307.)

**31**

The post-conviction court's finding was not unreasonable, however, given the general nature of Dr. French's conclusions, and the district court correctly concluded the same. Dr. French's opinion that McGill's methamphetamine use negatively affected his cognitive abilities and control over his behavior was notably silent on specifically how McGill's substance abuse impacted his actions of concocting the napalm-like mixture, throwing it on Banta and Perez, and then setting them aflame. (*See* ER 304–307.) The state court's finding that McGill failed to show how any expert, much less Dr. Beckson, could testify to such a link without McGill's willingness to discuss his culpability was therefore reasonable.

McGill next contends that the post-conviction court was unreasonable in dismissing Dr. French's opinion as speculative "because he had not personally evaluated McGill." (ER 24; ER 86; Dkt. 13, at 50.) But this is not what the post-conviction court concluded. Rather, it concluded that Dr. French's proffered testimony would not add anything to Dr. Lanyon's. (ER 86.) The state court concluded that because Dr. French did not evaluate McGill, "any testimony regarding Defendant's substance abuse history, including amounts used on the night in question, history of abuse and brain damage is speculative. His testimony would add nothing to Dr. Lanyon's testimony." (ER 86.) Dr. Lanyon testified at trial that McGill reported daily methamphetamine use. (ER 565–

**32**

566.) Thus, the post-conviction court was correct that any testimony from Dr. French, who relied on Dr. Lanyon's report, would have added nothing regarding the level of McGill's methamphetamine use unless Dr. French personally interviewed McGill, which he did not. (ER 26.) As a result, the court's finding that Dr. French's opinion was speculative and cumulative to Dr. Lanyon's testimony was reasonable.

Consequently, McGill has not satisfied the "daunting standard" required to establish that the post-conviction court's factual finding regarding Drs. French and Beckson was unreasonable. *See Taylor*, 366 F.3d at 1000. "McGill offers only speculation that an alternative course of action by counsel, such as renewing her request for a different addictionologist, would have resulted in the appointment of an expert whose testimony about McGill's drug use would have been more persuasive than Dr. Lanyon's. (*See* Doc. 30 at 77.)" (ER 25.) The district court correctly concluded that the state court reasonably denied McGill's ineffective assistance of penalty-phase counsel for failure to present different or additional addiction expert mitigation expert testimony.

### b. Sexual abuse.

Next, relying on Dr. Rosengard's report, McGill asserts that the post-conviction court made an unreasonable factual determination in concluding that he failed to substantiate his claim of sexual assault, and by extension, the district

court erred in concurring. First, the post-conviction court correctly noted that Lonnie Foster only discussed his *own* sexual abuse, and never asserted that McGill was sexually abused. (ER 87; ER 308–310; *see also* ER 28.) Dr. Rosengard's report stated only that McGill "said he was molested at a boys' ranch but did not disclose that previously" and that "he was abused in a boys' home by an older boy, when he was 8 or 9 and raped two different times by that person. He hit that person with a two-by-four and then the abuse stopped." (ER 195.) But when evaluated by Dr. Lanyon, McGill specifically denied ever being sexually abused. (ER 1569.) In light of McGill's contradictory statements and the lack of any support from other sources, the trial court's credibility determination—that McGill failed to substantiate the claim of sexual abuse he made to Dr. Rosengard—was not unreasonable. *See Rice*, 546 U.S. at 341–42 ("Reasonable minds reviewing the record might disagree about … credibility, but on habeas review, that does not suffice to supersede the trial court's credibility determination."); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (federal habeas courts possess "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

Again, McGill cites *Milke* to support his claim that the post-conviction court's finding that McGill failed to substantiate his claim of sexual assault was unreasonable, claiming that the court "'ha[d] before it, yet apparently ignore[d],'

**34**

evidence that [wa]s 'highly probative and central to petitioner's claim.'" (Dkt. 13, at 45.) However, McGill—who has the burden to show that the state court was unreasonable—failed to show how the post-conviction court was unreasonable in its decision when it weighed McGill's contradictory statements. *Taylor*, 366 F.3d at 1000. Instead, he makes the factually inaccurate conclusory statement that "[t]he record makes clear that McGill suffered sexual assault." (Dkt. 13, at 51.) The record is not clear. The only information presented to the Court about *McGill's* alleged sexual assault was his statement to Dr. Rosengard that he was sexually assaulted when he was 8 or 9. (ER 195.) Compare this to the statement he made to Dr. Lanyon that he was not sexually assaulted (ER 1569), and the record is not clear whether McGill was a victim of sexual assault.[5]

To bolster the claim, McGill cites to his half-brother Lonnie Foster's affidavit, which states that Lonnie was sexually assault while residing at Buckner's Boys Ranch. (ER 309; Dkt. 13, at 51.) However, in a footnote, McGill claims that the location of the assault was actually Boysville. (Dkt. 13, at 51, n 17.) He provides no proof of these errors; he simply makes the conclusory

─────────────────────

[5] Any references to evidence that was not submitted to the state court may not be considered. *Pinholster*, 563 U.S. at 185. Of note, McGill does not acknowledge *Pinholster* at all. (*See* Dkt. 13.)

statement that they are incorrect. (*Id.*) Regardless, Foster makes no mention of whether McGill also was sexually abused—either at Buckner or Boysville. (*See* ER 308–310.) If the Court were to follow McGill's logic, *all* boys who resided at the facility during the time of Foster's stay suffered sexual assault—an absurd conclusion. Therefore, the district court correctly found that the post-conviction court reasonably determined the facts surrounding McGill's alleged sexual abuse.

### c.      **"Brain damage and cognitive dysfunction."**

Finally, McGill claims that the post-conviction court's determination of the facts regarding Schaffer's use of Dr. Lanyon was unreasonable. However, as discussed below, the district court correctly upheld the state court's findings.

McGill claims: "[t]he post-conviction court's finding that it was reasonable for Schaffer's office to require her to retain [Dr.] Lanyon as neuropsychologist because he was on retainer is objectively unreasonable." (Dkt. 13, at 52.) However, McGill mischaracterizes the post-conviction relief holding. It found, "Dr. Lanyon is a qualified expert and Ms. Schaffer was entitled to rely on the competency of his evaluation of the defendant." (ER 86.) This conclusion was reasonable.

As background, Ms. Schaffer stated that she "wanted a neuropsychological evaluation of Mr. McGill." (ER 322.) Her supervisor

approved Dr. Lanyon. (ER 218; ER 220.) Ms. Schaffer never identified which neuropsychologist that she wanted to use. (*See* ER 216–218; ER 322–324.) Ms. Schaffer's supervisor, "Ms. Sherwin[,] thought that Dr. Lanyon was an excellent expert, and absent extenuating circumstances, . . . the death penalty litigators[] were to use him in [] capital cases." (ER 220.) Further, when asked if there was any specialist that she wanted to retain but was unable to, she testified that she was not able to retain a domestic violence expert or the specific addictionologist she wished, although she conceded that she retained a different addictionologist who was a medical doctor. (ER 199, 216–220.) Ms. Schaffer did not testify that she knew of a different neuropsychologist that she preferred to retain, rather than Dr. Lanyon. (*See* ER 199, 216–220.)

McGill couches his argument that the post-conviction court's holding was unreasonable under the guise of being denied the ability to retain an expert "tailored specifically to the needs of the case," as opposed to "an 'all-purpose' expert." (Dkt. 13, at 52–53,) However, Dr. Lanyon, a neuropsychologist, is not an "all-purpose expert." (*See* SER 69, 73, 93.) He is nationally board certified in clinical psychology as well as forensic psychology. (SER 69, 72.) When asked about his specialty, Dr. Lanyon replied, "My specialty within those general areas [of forensic psychology] is psychological assessment." (SER 69, 72–73.) He said that he conducted "a general psychological evaluation, plus

**37**

neuropsychological testing." (SER 69, 103.) Further, as previously discussed, McGill also hired an addictionologist, an expert in another field. (ER 199, 218–219.) Thus, he retained experts to fit the needs of his case.

Finally, McGill attempts to use "the distorting effects of hindsight" to explain why Schaffer was constitutionally ineffective by calling Dr. Lanyon to testify. *Strickland*, 466 U.S. at 689. Schaffer made the strategic decision to withhold a pre-sentence report from Dr. Lanyon. (ER 19–20; ER 1738.) The prosecutor used those documents to discredit Dr. Lanyon on the specific point of whether McGill's alleged head injury caused amnesia of the prior crimes. (ER 460, 599–600; *see also* SER 46–51.) The fact that the prosecutor's cross-examination of Dr. Lanyon on one point was effective does not mean defense counsel was constitutionally ineffective. Simply because a strategic action does not achieve the intended goal does not mean that the decision was unreasonable. *Strickland*, 466 U.S. at 689. The post-conviction court reasonably concluded similarly.

### 2. *The post-conviction court reasonably applied* Strickland.

The post-conviction court reasonably applied *Strickland*, contrary to McGill's assertion. As an initial matter, McGill claims throughout his argument that counsel failed to fulfill various "duties," including having a "relationship of trust" with McGill and his family and retaining experts. (Dkt. 13, at 58–71.) In

so doing, McGill incorrectly states the applicable Federal law governing ineffective assistance of counsel. The only "duty" incumbent on counsel is to make objectively reasonable decisions in light of the facts and circumstances before him: "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89; *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) ("*Strickland* stressed . . . that [ABA] standards and the like are only guides to what reasonableness means, not its definition. We have since regarded them as such"); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms"). For the following reasons, McGill is not entitled to relief.

### a. Failure to develop a relationship of trust.

McGill faults counsel for allegedly failing to develop a relationship of trust with him and his family; he contends that this failure was harmful because he and his family never trusted counsel enough to reveal crucial mitigation evidence. (Dkt. 13, at 59–60.) However, the district court correctly found that the post-conviction court reasonably applied *Strickland* to reject the claim that

counsel were deficient for failing to elicit additional mitigation from McGill's family.

To begin, McGill claims in a footnote that "[t]he district court misconstrued this part of the claim as faulting counsel for failing to have a 'meaningful' relationship with McGill." (Dkt. 13, at 60.) However, McGill does not explain the difference between a "meaningful relationship" and a "relationship of trust." Moreover, he fails to provide any law—let alone clearly established Federal law—to show that he is entitled to a "relationship of trust" with his attorney or how that relationship would or should appear. His sole authority for this issue is the 2003 ABA Guidelines, guidelines which the Supreme Court has held are just that—guidelines. *Strickland*, 466 U.S. at 688–89; *see also Van Hook*, 558 U.S. at 8 ("*Strickland* stressed . . . that [ABA] standards and the like are only guides to what reasonableness means, not its definition. We have since regarded them as such"); *Wiggins*, 539 U.S. at 521 (court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms").

In fact, McGill does not contend that his penalty-phase counsel failed to make "an appropriate effort to establish" this "relationship of trust" that he

**40**

wants the courts to determine that he is owed. *See* 2003 ABA Guideline 10.5. He merely asserts conclusory statements that he and his family did not trust his attorney. (Dkt. 13, at 59–62.) However, these statements are not supported by any evidence.[6] Of course, there is no right to a "'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983); *see also Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008). (*See also* ER 17.) Because there is no right to a "'meaningful relationship' between an accused and his counsel[,]" there can be no right to a "relationship of trust." (ER 17.)

McGill analogizes his case to *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005), which does not in any way suggest that a defendant is entitled to a "relationship of trust" with his attorney, but only discusses the need for consultation between client and attorney. 427 F.3d at 633. Unlike here, in *Summerlin*, counsel did not conduct any investigation or consult with the client. *Id.*, at 634. The district court correctly observed:

> Here, by contrast, neither the status of the lawyer-client relationship nor the number of hours spent in direct consultation with McGill prevented counsel from investigating and presenting a wealth of mitigating information, including detailed testimony from several

---

[6] The district court correctly held that any assertion of potential evidence to support this claim was barred, as it was not presented to the state courts. *Pinholster*, 563 U.S. at 185. (*See also* ER 18.)

family members and voluminous records documenting McGill's family and social background.

(ER 18.) The district court correctly held that the state court reasonably determined McGill's trial counsel were not ineffective for failure to establish a "relationship of trust."

Further, this claim fails because the district court found that the post-conviction court reasonably applied *Strickland* when it concluded that trial counsel were not deficient for failing to obtain additional mitigation evidence from McGill's family. Indeed, as the district court found, McGill fails to identify what additional mitigation counsel might have obtained and presented, other than McGill's alleged sexual assault, which he admits that he previously never revealed to anyone.[7] (*See* Dkt. 13, at 59–62; ER 17–18; ER 153.) Despite this claim, in the post-conviction relief proceeding, McGill presented Schaffer's affidavit stating that several of McGill's family members failed to cooperate with the mitigation investigation and that Lonnie Foster refused to testify. (ER 324.) McGill also asserted that Schaffer was ineffective for failing to subpoena Foster and to more effectively cross-examine Cordell and Kean regarding conditions and alleged sexual abuse at the group homes where McGill also

---

[7] McGill attempted to present evidence to the district court that was not presented to the state court; however, the district court correctly refused to consider this evidence—which is not presented here—because "*Pinholster* forbids the consideration of this new evidence." (ER 18.)

lived. (ER 324; 348–351; 356–360.) However, the state court record lacks any support for the idea that McGill and his family members withheld any mitigating evidence, much less that they did so because they did not trust defense counsel.

McGill's contention that counsel could have discovered additional mitigation evidence had they not allegedly failed to develop a relationship of trust with McGill and his family is wholly speculative. Thus, "[w]ithout evidence that counsel's mitigation strategy arose from ignorance, inattention or ineptitude, *Strickland's* strong presumption must stand." *Greiner v. Wells*, 417 F.3d 305, 326 (2nd Cir. 2005); *accord Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").

The information in the affidavits presented in the post-conviction proceedings added nothing to the extensive mitigation presentation regarding McGill's tumultuous and difficult childhood. Trial counsel presented testimony from numerous family members who detailed McGill's upbringing, as well as Brewer and Dr. Lanyon who further discussed McGill's difficult childhood and the effect that it had on his life. (ER 460, 549–577; ER 635–638, 642–645, 650, 652–654, 656–658, 661–668, 678–680; ER 760, 780-781, 785; ER 1310; ER 1396–1397; ER 1398–1401, 1405; ER 1424–1426.) Under these circumstances,

the post-conviction court reasonably applied *Strickland* when it determined that trial counsel were not deficient for failing to present additional mitigation evidence from McGill's family.

For the foregoing reasons, the district court correctly held that the post-conviction court reasonably applied *Strickland* to reject this contention.

### b. Failure to obtain records.

McGill next faults counsel for failing to "obtain and provide experts several 'classic' sources of mitigation." (Dkt. 13, at 62.) But the post-conviction court reasonably applied *Strickland* to conclude that counsel were not deficient for failing to investigate and develop significant mitigation.

Once again, McGill attempts to support this claim wholly with speculation. McGill makes the bold assertion that the missing "records include crucial mitigation evidence, including test scores and grades from third and fourth grade, information about McGill's drug use, and about his juvenile record. These records would have aided Lanyon in evaluating McGill, and revealed other potential witnesses and sources of mitigation." (Dkt. 13, at 62.) However, the record supports the post-conviction court's conclusion that counsel's mitigation investigation was not deficient. The mitigation presentation included extensive testimony regarding McGill's childhood, including his poor academic performance, placement at Bucker's Boys Ranch and Boysville, and

**44**

juvenile crimes. (ER 460, 549–577; ER 635–638, 642–645, 650, 652–654, 656–658, 661–668, 678–680; ER 760, 780–781, 785; ER 1310; ER 1396–1397; ER 1398–1401, 1405; ER 1424–1426.) Further, Brewer prepared, admitted into evidence, and testified regarding Trial Exhibit 48, which contained extensive records from McGill's life. (ER 1310–1685.) Also, Dr. Lanyon noted that he reviewed numerous records for his evaluation of McGill and testified at the post-conviction evidentiary hearing that he was satisfied with the background information that he received. (ER 460, 548; SER 69, 78, 81.)

Under these circumstances, the post-conviction court reasonably applied *Strickland* to reject McGill's claim that counsel were constitutionally ineffective for failing to investigate and develop significant mitigation. (ER 19.) This is especially so given the absence of any evidence of the specific records counsel failed to obtain, that these records existed and were obtainable by counsel, and how the records would have assisted in the mitigation presentation.

Finally, McGill's reliance on *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008), is unpersuasive. In *Correll*, the Ninth Circuit faulted counsel for failing to explore "*any* avenues" that might have led to potential mitigating evidence that counsel knew existed. 539 F.3d at 943 (emphasis added). Here, in contrast, counsel investigated and presented a multitude of mitigating evidence, characterized by the Arizona Supreme Court in its direct review of McGill's

death sentence as "not insignificant." (ER 125.) *McGill*, 140 P.3d at 945, ¶ 68. This case does not, therefore, support McGill's contention that counsel's mitigation investigation constituted deficient performance.

### c. Failure to adequately prepare Dr. Lanyon.

McGill next contends that counsel failed to adequately prepare Dr. Lanyon. (Dkt. 13, at 63–66.) Specifically, he argues that trial counsels' decision not to provide Dr. Lanyon with the police reports and a presentence report from McGill's prior armed robbery convictions amounted to constitutionally ineffective assistance. The record shows, however, that the post-conviction court reasonably applied *Strickland* when it concluded that counsel's performance with respect to Dr. Lanyon's testimony was not deficient.

Dr. Lanyon's report indicated that the documents he reviewed included grand jury transcripts from the crime at issue, Arizona Department of Corrections records, junior high school records, a 1974 educational evaluation, Boysville records, Buckner records, and notes from interviews with Ann McGill, Lonnie Foster, Mark Callahan, Ron Wendler, and Angela Taylor, in addition to the doctor's own interview with and testing of McGill. (ER 1562–1563.) Dr. Lanyon testified at trial that McGill maintained that he had no memory of the prior robberies, and opined that this memory lapse supported McGill's claim that he had suffered head injuries in an auto accident:

**46**

> [A]s a matter of fact, he said he had no recollection of these robberies at all. He readily agreed he did it, because people were there and they reported he did it and he saw no reason to doubt it. I thought at the time I did this that he had drunk too much and had no memory, but my later opinion of this, having written the report and sort of reflected on it, that it's more likely that the head injury itself wiped out his memory which is a common occurrence with head injuries.

(ER 460, 563–564.)

On cross-examination, after the prosecutor read from a police report on the armed robberies in which McGill had recounted his commission of the crimes in detail, Dr. Lanyon agreed that it appeared that at the time of his interview with police, McGill had a memory of the robberies, and that, therefore, McGill could not have had any amnesia from a head injury at that time. (ER 460, 596–602.) Dr. Lanyon added, however, that McGill's past memory of the armed robberies did not rule out a brain injury, but simply meant that he did not have "amnesia for those events at least until the time he spoke with police." (ER 600.)

At the post-conviction evidentiary hearing, Schaffer testified that "[i]n the presentence report, Leroy had allegedly told the probation officer when she interviewed him that he had a child, and he—this was on one of the armed robberies—and he needed to get out to be with that child, and we couldn't prove that." (ER 1738.) Thus, Schaffer decided not to provide Dr. Lanyon with the report—which would have indicated that McGill remembered the armed

**47**

robberies—because she believed McGill had lied in the report about having a child. (ER 19; ER 1738.) Schaffer confirmed "that was a strategic decision on [her] part." (ER 1738.)

McGill's reference to *Rompilla* is misplaced. In that case, the defense attorneys failed to research any of the facts relating to Rompilla's underlying conviction, which the prosecution alerted Rompilla it planned to use for several purposes. *Rompilla v. Beard*, 545 U.S. 374, 384 (2005). *Rompilla* held that trial counsel have a duty to investigate. *Id.*, at 387. Here, defense counsel had the information but made the strategic decision to not share it with an expert.

Schaffer's tactical decision did not constitute deficient performance. Had counsel provided Dr. Lanyon with the presentence report, which contained McGill's fabricated story about having a child, then Dr. Lanyon would have had to question the credibility of any statements McGill made to him. In other words, had counsel provided Dr. Lanyon with the presentence report, the expert would have been forced to acknowledge McGill's untruthfulness. Doing so would have negatively impacted McGill's credibility, which, in turn would have undermined McGill's self-reported head injury, on which Dr. Lanyon relied in part for his conclusion that McGill had suffered some brain damage.

Furthermore, while the State was able to use the police report to show that McGill remembered the armed robberies when interviewed by the police, this

**48**

did not conclusively establish that McGill lied when he told Dr. Lanyon, almost 20 years later, that he did not remember the crimes. As Dr. Lanyon noted in his trial testimony, the police reports did not speak to any lack of brain injury, but simply showed that McGill did not suffer from amnesia at the time he spoke to the police. (ER 460, 600.) Thus, McGill's statements to police in 1986 were not necessarily inconsistent with his statements to Dr. Lanyon nearly 20 years later.

Finally, McGill's contention that the presentence report's reference to him having a child was an error made by the report writer has no basis in fact. To the extent McGill bases this assertion on evidence not presented in the state court, this Court should reject his contention. *See Pinholster*, 563 U.S. at 185.

Under these circumstances, and viewed from counsel's perspective at the time, without "the distorting effects of hindsight," the tactical decision not to provide Dr. Lanyon with the presentence report was not objectively unreasonable. *Strickland*, 466 U.S. at 689. Thus, neither the district court nor the post-conviction court erred in their findings.

> **d.  Failure to adequately investigate, present, and explain evidence of substance addiction, sexual assault, and domestic violence.**

McGill next criticizes counsel for failing to obtain and present additional evidence of his history of substance abuse, sexual assault victimization, and his status as a victim of domestic violence, and to have that evidence presented by

**49**

experts. However, the district court correctly found that the state court reasonably applied *Strickland* and its decision was owed deference. The state court reasonably found that the additional mitigatory evidence was cumulative and would not have altered the jury's verdict.

To begin, McGill faults the district court for citing other circuit cases to support its decision. (Dkt. 13, at 67.) However, the district court used the most direct language to explain its ruling, which happened to be from another circuit.

> The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate. *See Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir.1990); *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir.1990).

*Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998). As the *Harris* court explained, "[a]llowing such battles of psychiatric opinions during successive collateral challenges to a death sentence would place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas process." *Harris*, 949 F.2d at 1518. Thus, the district court and post-conviction court correctly held that it was not ineffective assistance of counsel for penalty-phase counsel to rely on Dr. Lanyon's testimony regarding McGill's substance abuse and domestic violence abuse.

/ / /

/ / /

**50**

**i.** *Substance abuse.*

McGill next faults counsel for failing to obtain and present evidence of his history of drug use, evidence of the amount and type of drugs he used around the time of the murder, and expert testimony on the ramifications of such drug use. (Dkt. 13, at 67–68.) The post-conviction court reasonably applied *Strickland* when it rejected this claim.

The state-court trial record supports the post-conviction court's rejection of McGill's claim that counsel failed to adequately obtain and present evidence of drug use. Dr. Lanyon testified in the penalty phase that McGill reported using marijuana from the age of 13 and had used it daily since, except for his periods of incarceration. (ER 460, 565–566.) McGill also told Dr. Lanyon that after his release from prison in 1993, "he became a heavy crystal meth user instead, a daily crystal meth user." (ER 460, 566.) In addition, Dr. Lanyon's report, admitted at trial, stated that McGill "had been actively using methamphetamine and had been awake for several days at the time of the events with which he is charged." (ER 460, 547; ER 1562, 1570.) Dr. Lanyon explained that methamphetamine use causes paranoia and impairment in judgment, and that its chronic use "would remove any remaining fragment of ability to reason …" (ER 566.)

First, counsel were not deficient for failing to investigate and present additional evidence of McGill's history of drug use and drug use around the time of the murder. McGill reported to Dr. Lanyon his history of drug use and that he had been using methamphetamine without sleep for several days at the time of the murder, and the jury received this information through the doctor's testimony and report. (ER 460, 566; 1562–1576.) Moreover, McGill proffered no additional details regarding his drug use in the post-conviction relief proceedings, nor even indicated where such information might have been found. Without any indication that additional evidence regarding McGill's drug use even existed, counsel's failure to obtain more such evidence cannot have been deficient performance.

Second, counsel were not deficient for failing to retain and present cumulative testimony from an addiction specialist. As already discussed, Schaffer retained Dr. Beckson, but did not call him after he stated his testimony would not be helpful so long as McGill refused to acknowledge culpability. In any event, Dr. Lanyon testified regarding McGill's methamphetamine use and the effects of using that drug; Dr. French's opinion, that McGill's chronic use of methamphetamine and "an underlying brain injury negatively affected" his "cognitive abilities and control over his behavior" would have been cumulative and added nothing to Dr. Lanyon's similar testimony on the same topic. (ER

**52**

304, 307.) Further, Dr. French's opinion was even weaker than Dr. Lanyon's because he did not examine McGill, and thus did not ask him about specific amounts of methamphetamine McGill used at the time of the crime or how it affected him. Under these circumstances, the trial court reasonably applied *Strickland* in concluding that trial counsel's failure to admit additional, cumulative evidence of drug use did not amount to deficient performance.

### ii.    *Sexual assault.*

McGill also attacks trial counsel for failing to discover and present evidence of his alleged sexual assault at Boysville. This issue is well-settled. The post-conviction court did not unreasonably apply *Strickland* in rejecting this contention because counsel cannot be faulted for failing to investigate a theory for which there was no evidence. *See Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998), (quoting *Matthews v. Evatt*, 105 F.3d 907, 920 (4th Cir. 1997)) (no ineffective assistance when attorneys fail to uncover mitigating evidence when "nothing has put the counsel on notice of the existence of that evidence"); *see also Kornahrens v. Evans*, 66 F.3d 1350, 1361 & 1361 n.10 (4th Cir. 1995) (no ineffective assistance where counsel did not pursue theory of sexual abuse where the defendant gave counsel no indication of such abuse); *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008) (no ineffective assistance when attorneys fail to uncover evidence of childhood abuse that client does not mention);

**53**

*Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1210–11 (11th Cir. 2007) (no ineffective assistance for counsel's failure to discover childhood abuse as defendant failed to tell counsel about it); *Henyard v. McDonough*, 459 F.3d 1217, 1245 (11th Cir. 2006) (no ineffective assistance for not investigating or presenting evidence of childhood sexual abuse after defendant denied being sexually abused). (*See also* ER 27–28.)

Although Respondents do not agree with the district court that McGill's attorneys were put on notice of possible sexual abuse victimization, Respondents agree with the court's findings that trial counsel did not ignore this potential mitigation. (ER 28.) Counsel interviewed and presented testimony from numerous family members, and obtained voluminous records from McGill's childhood, none of which gave the slightest indication of a sexual assault. (ER 148, 1311–1319, 1322–1467, 1589–1602, 1604–1671,[8] 1673–1685; *see also* ER 28.) Moreover, McGill *explicitly denied* in his interview with Dr. Lanyon that he had been sexually assaulted. (ER 1569.) Further, even assuming McGill was truthful regarding the alleged assault with Dr. Rosengard, he must bear some responsibility for denying any sexual abuse during his interview with

---

[8] ER 1629 is listed as a letter from Ann McGill; it is a letter from Arthur Foster.

**54**

Dr. Lanyon. *See Babbit*, 151 F.3d at 1174; *Kornahrens*, 66 F.3d at 1361 & 1361 n.10; *Henyard*, 459 F.3d at 1245.

Finally, nothing but McGill's own statement to Dr. Rosengard—which was made 6 years after trial, was unsupported by any other evidence, and was directly contradicted by his statement to Dr. Lanyon—indicates that any sexual assault actually occurred.[9] Moreover, McGill claims that even Dr. Rosengard's report is inaccurate, but the evidence to support such a claim is outside of the state court record and is therefore inadmissible. *See Pinholster*, 563 U.S. at 185. The district court also noted that McGill now claims that the location of the alleged assault—and that of his half-brother's, Lonnie Foster's, assault—changed from his initial claim in his post-conviction petition to suit his story. (ER 26, n 5.) Finally, Dr. Rosengard stated that McGill lied. (ER 193 ("Inconsistencies were noted in McGill's statements.").) Therefore, it is just as possible that McGill fabricated the sexual abuse claim after spending years on death row.

_____

[9] Again, McGill cites to evidence outside of the state court record to bolster his claims, which this Court may not consider. (ER 152–154; ER 1739–1748.) Although ER 1739–1748 is not identified in McGill's ER's table of contents, it contains portions of Dr. Robert Smith's Psychological Summary of McGill, which was not presented in state court. *See Pinholster*, 563 U.S. at 185.

Under these circumstances, counsel cannot have performed deficiently by failing to investigate a theory which, if true, McGill possessed personal knowledge of but never gave counsel the slightest indication existed. "It is black-letter law that counsel cannot be found deficient for believing what his client plausibly tells him." *Mickey v. Ayers*, 606 F.3d 1223, 1242 (9th Cir. 2010). (*See also* ER 28.) "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.

> "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. Here, it was not unreasonable of counsel to fail to discover evidence of an incident that McGill explicitly denied and did not disclose until six years after his trial. McGill does not cite any additional steps counsel could have taken that would have led him to disclose the alleged sexual abuse.

(ER 28.)

McGill cites *Milke* to support his claim that the post-conviction court unreasonably applied *Strickland*. However, McGill's reliance on *Milke* is misplaced. The court did not make its ruling based on whether McGill substantiated his allegation of sexual abuse. Instead, the court found that Schaffer did not provide ineffective assistance in failing to discover McGill's alleged sexual abuse. (ER 86–87.) Instead of dismissing the claim outright, the

court explained why the new evidence did not show that Schaffer was ineffective in failing to discover the evidence. Therefore, neither the post-conviction court nor the district court erred in applying *Strickland*.

### iii. *Domestic violence.*

In his final allegation, McGill points this Court to specific statements during the trial in his attempt to prove that trial counsel was ineffective by failing to properly investigate and present expert testimony about McGill's status as a victim of domestic violence. (Dkt. 13, at 71.) However, all of these statements are taken out of context and, thus, are inaccurate. Neither the post-conviction court nor the district court erred in its application of *Strickland*.

To begin, the district court did not find that "the post-conviction court was correct to hold that 'there was no evidence of domestic abuse between McGill and Hardesty.' (ER 16.)" (Dkt. 13, at 71.) Instead, the district court made the factual statement that "[t]he court found … that there was no evidence of domestic abuse between McGill and Hardesty so counsel did not perform ineffectively in failing to secure appointment of a domestic abuse expert[.]" (ER 16.)

The district court did find that the post-conviction court's decision rejecting McGill's ineffective assistance of counsel claim was neither contrary to nor an unreasonable application of clearly-established federal law. (ER 22.)

**57**

Instead, the district court agreed with the post-conviction court that trial counsel presented a great deal of mitigating evidence to the jury. (ER 22.)

> [F]amily members and Dr. Lanyon testified about the dynamics of [McGill's] relationship [with Hardesty] and its negative effects on McGill. He was under her control, passive, a follower; she was violent, destructive, controlling, and a bad influence. Dr. Lanyon … explained that McGill was particularly vulnerable to Hardesty because of his own pathologies and the distorted view of relationships he developed as the child of a neglectful mother. Dr. Lanyon testified that to "survive emotionally" McGill had to accommodate his mother's behavior in abandoning and neglecting him. He repeated this pattern in his relationship with Hardesty, tolerating her bad behavior in order to preserve the relationship.
>
> …
>
> Dr. Rosengard's diagnosis of dependent personality disorder does nothing but add a name to the condition described by the witnesses at sentencing, including Dr. Lanyon, who detailed the dysfunctional relationship between McGill and Hardesty. Dr. Wu simply echoed Dr. Lanyon's opinion that only a pathological person would maintain a relationship with a person like Hardesty.

(ER 22–23 (internal citations omitted).)

Moreover, McGill fails to relay that trial counsel described McGill's relationship with Jonna as abusive and controlling. (SER 53, 56–57.) Schaffer pointed this out to the jury and explained in detail that McGill was a victim of domestic abuse. (SER 53–59.) "He would simply cope with her psychoses, her addictive behaviors *and her serious mental and physical abuse*." (SER 53, 56 (emphasis added).) Hardesty's behaviors were "a very, very, strong sign of [control in] an abusive relationship." (SER 53, 56.) Schaffer used the term

"sick" to describe McGill's "codependent" relationship with Hardesty, painting him as the *victim* in the relationship, not as one who was depraved. (ER 400.)

McGill also contends that Dr. Lanyon painted McGill as someone who "showed [] depravity." (Dkt. 13, at 71.) However, Dr. Lanyon explained that McGill was a victim of domestic abuse, first at the hands of his mother and then, because of his mother's abuse and neglect, by Hardesty. (ER 553–555.) Dr. Lanyon explained that McGill learned how to "cope with that great anxiety and great terror of abandonment in several ways." (ER 554–555.) This was necessary on McGill's part to deal with the tremendous loss of being abandoned by his own mother. (ER 22, 555.)

Therefore, the post-conviction court did not err in finding that McGill's counsel were not ineffective because "[t]he jury was not, as McGill argues, 'left to wonder why McGill stayed with Hardesty despite her bizarre and abusive behavior.'" (ER 22.) They had the benefit of hearing from an expert how Hardesty's abusive power over McGill caused him to become a murderer. (ER 22.)

### 3. *The post-conviction court reasonably applied Strickland when it concluded that McGill failed to establish prejudice.*

The post-conviction court reasonably applied *Strickland* when it concluded not only that McGill had not established counsel's deficient performance, but also that he failed to establish a reasonable probability that he

would have received a life sentence had trial counsel presented the evidence proffered in the post-conviction proceeding, and therefore failed to prove *Strickland* prejudice.

The jury had ample evidence of McGill's difficult, chaotic, and abusive childhood, his chronic drug use, his previous felonies, the effects of his abusive and dysfunctional relationship with Hardesty on his behavior, the results of his psychological tests, and his actions on the day he poured gasoline over and set fire to his victims, murdering Perez and seriously injuring Banta. Additionally, Dr. Lanyon testified in the areas McGill asserts the mitigation presentation was lacking; Dr. Lanyon explained the intersection between McGill's childhood, mental condition, chronic drug use, and relationship with Hardesty, and how these factors combined to affect his behavior. (ER 460, 566, 568–570, 572, 628.) Significantly, Dr. Lanyon never stated that any of the additional evidence offered in the post-conviction proceeding would have changed the results of his evaluation. Thus, any additional evidence on these topics would have been cumulative and would not have affected the outcome. *See, e.g., Wong v. Belmontes*, 558 U.S. 15, 20–25 (2009) (no prejudice from failure to present "humanizing" mitigating evidence that would have been cumulative to evidence presented); *Cox v. Ayers*, 613 F.3d 883, 900 (9th Cir. 2010) (no prejudice from failure to present additional mitigating evidence where evidence was cumulative

of penalty phase evidence); *Matylinsky v. Budge*, 577 F.3d 1083, 1096–97 (9th Cir. 2009) (where counsel presented humanizing evidence, petitioner could not show prejudice from failure to present additional, cumulative evidence); *Babbit*, 151 F.3d at 1176 (finding no reasonable probability of life sentence where evidence not presented would have been cumulative) (collecting cases).

Similarly, the reports by Drs. Wu and Rosengard added nothing to Dr. Lanyon's testimony. As Dr. Lanyon noted, Dr. Wu's findings were simply "not inconsistent" with Dr. Lanyon's conclusions, and Dr. Rosengard's opinions on the effects of McGill's mild brain damage, emotional trauma, drug use, and susceptibility to dysfunctional relationships only mirrored Dr. Lanyon's trial testimony. (SER 69, 100–101; compare ER 460, 549–577; SER 233, 247–269; *see also* ER 81–82.) Thus, if presented at trial, these experts would have added nothing, but simply restated the testimony Dr. Lanyon provided. *See Belmontes*, 558 U.S. at 20–25; *Cox*, 613 F.3d at 900; *Matylinsky*, 577 F.3d at 1096–97; *Babbit*, 151 F.3d at 1176. In addition, the post-conviction court noted that Drs. Wu and Rosengard provided contradictory testimony regarding the lasting effects of drug use on the brain, which may well have harmed the mitigation case if presented at trial. (ER 82.) Under these circumstances, the post-conviction court reasonably concluded that this evidence had no reasonable probability of affecting the verdict.

Further, this additional expert testimony would not have established the A.R.S. § 13–703(G)(1) factor, and would not have carried significant weight as a nonstatutory mitigating factor, in light of McGill's efforts to avoid prosecution after committing the murder, evidenced by telling Johnson that "he had to act like [he] didn't know anything," and attempting to have a witness killed while awaiting trial. (ER 408, 415–432; ER 1160, 1198–1119.) *See State v. Rienhardt*, 951 P.2d 454, 466–67 (1997) (claim of drug or alcohol impairment under (G)(1) fails "when there is evidence the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior").

Additionally, the post-conviction court reasonably accorded little weight to McGill's statement to Dr. Rosengard that he was sexually assaulted at Boysville because it was not substantiated by any other evidence and was directly contradicted by McGill's denial of any sexual abuse to Dr. Lanyon. (ER 86–87.) Nor did Dr. Rosengard mention the alleged sexual assault in his conclusions, which were mostly limited to his opinion that McGill's difficult childhood made him susceptible to the relationship with Hardesty—a finding, as mentioned above, fully addressed by Dr. Lanyon at trial. (ER 197–198.)

In light of the cumulative and unpersuasive nature of the additional mitigation evidence proffered by McGill, the post-conviction court reasonably

**62**

determined that, had trial counsel presented this evidence at sentencing, the jury would still have imposed a death sentence in light of the weighty aggravation and the undeniably horrendous facts of the murder. *See Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) ("Regardless of any mitigation case deficiencies, given the significant mitigating evidence actually presented, the speculative mitigating evidence counsel failed to introduce is insignificant to outweigh the powerful aggravating circumstances surrounding Jennifer's murder."); *Brown v. Ornoski*, 503 F.3d 1006, 1016 (9th Cir. 2007) (denying relief because of extensive aggravating evidence); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1042 (9th Cir. 1997) (counsel's failure to introduce available mitigation did not entitle Gerlaugh to relief because of the substantial aggravation); *Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995) ("[W]here the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence"). McGill's "mitigation strategy failed, but the notion that the result could have been different if only [counsel] had put on more than the [] witnesses he did, or called expert witnesses to bolster his case, is fanciful." *Belmontes*, 558 U.S. Ct. at 28.

/ / /

/ / /

**63**

## CONCLUSION

For the foregoing reasons, the post-conviction court reasonably applied *Strickland* to reject McGill's claim and the district court properly upheld that decision.

Respectfully submitted,

Mark Brnovich
Attorney General

Lacey Stover Gard
Chief Counsel

s/ Erin D. Bennett
Assistant Attorney General

Attorneys for Respondents-Appellees

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28–2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, Respondent-Appellees state that they are unaware of any related cases.

s/  Erin D. Bennett
Assistant Attorney General

**65**

# CERTIFICATE OF COMPLIANCE

Pursuant to Circuit Rule 32–1, Rules of the Ninth Circuit Court of Appeals, I certify that this brief is proportionately spaced, has a typeface of 14 points or more and contains 14,062 words.

s/ Erin D. Bennett
Assistant Attorney General

**66**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 27, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ M. Palacios
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
2005 N. Central Avenue
Phoenix, Arizona 85004–1580
Telephone: (602) 542–4686